# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ETHANOL BOOSTING SYSTEMS, LLC, and MASSACHUSETTS INSTITUTE OF TECHNOLOGY<br><br>           Plaintiffs,<br><br>   v.<br><br>FORD MOTOR COMPANY<br><br>          Defendant. | Civil Action No. 20-cv-706-CFC-JLH<br><br>**JURY TRIAL DEMANDED** |

## JOINT CLAIM CONSTRUCTION BRIEF

Dated: February 17, 2021

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Of Counsel:

Matthew R. Berry
Andres C. Healy
Steven M. Seigel
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, Washington 98101

Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
mflynn@mnat.com

OF COUNSEL:

Michael S. Connor
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street
Charlotte, NC 28280

(206) 516-3880
(206) 516-3883
mberry@susmangodfrey.com
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

William D. O'Connell
SUSMAN GODFREY LLP
1301 Ave. of the Americas,
32nd Fl.
New York, New York 10019-6023
(212) 336-8330
(212) 336-8341
boconnell@susmangodfrey.com

*Attorneys for Plaintiffs*

(704) 444-1022

Natalie C. Clayton
Andrew J. Ligotti
Katie Burkhart
ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, NY 10016
(212) 210-9573

Brian Hill
ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004
(202) 239-3733

*Attorneys for Defendant*

# TABLE OF CONTENTS

I.    **BACKGROUND** ..................................................................................3

       1.   **Plaintiffs' Opening Statement** ..............................................3

           a)   Relationship to the Ford I Patents ...................................4

           b)   The Crux of This Case ......................................................5

           c)   The Patented Invention .....................................................8

       2.   **Ford's Answering Statement** ...............................................13

       3.   **Plaintiffs' Reply Statement** ................................................15

       4.   **Ford's Sur-Reply Statement** ...............................................21

II.   **AGREED-UPON CONSTRUCTIONS** .................................................22

III.  **DISPUTED CLAIM CONSTRUCTIONS** .............................................26

      A.   **"directly injected fuel" (and variants thereof)** ['965: Claims 1, 6, 14, 17, 19, 21; '760: Claims 1, 13, 21, 29; '580: Claims 1, 6, 13, 23] ...................................................................26

       1.   **Plaintiffs' Opening Position** ..................................................26

           a)   The Bromberg Patents Disclose Embodiments That Use the Same Fuel for Both Direct and Port Injection. ...........................................................................27

           b)   The Bromberg Patents Disclose Embodiments That Direct Inject Only Gasoline. .................................29

       2.   **Defendant's Answering Position** ...........................................32

           a)   The Language of the Claims Supports Ford's Construction ....................................................................34

           b)   The Specification Supports Ford's Construction ...........34

           c)   EBS Disclaimed Single-Fuel Engines in the Prosecution History .......................................................38

d)     EBS Mischaracterizes Statements in the Specification and the Claims ........................................40

e)     Ford's Previous Statements do not Warrant Rejecting Ford's Construction............................................43

3.     **Plaintiffs' Reply Position** ........................................................45

a)     Ford's "Different Fuels" Requirement Is Wrong. ........................................................................46

(1)     *Ford Identifies Nothing in the Specification to Support Its "Different Fuels" Requirement.* ............................................46

(2)     *The Bromberg Patents Disclose Embodiments That Use the Same Fuel for Both Direct and Port Injection*..............................46

b)     Ford's "Not Gasoline" Requirement is Also Wrong. ........................................................................51

(1)     *The Claims Contradict Ford's "Not Gasoline" Requirement.*........................................51

(2)     *The Specification Contradicts Ford's "Not Gasoline" Requirement.*..............................53

c)     Ford's Prosecution History Argument Fails.................57

4.     **Defendant's Sur-Reply Position** ........................................60

a)     The Specification and Claim Language Support Ford's Construction ........................................................60

(1)     *"Different Fuels"* ........................................................60

(2)     *"Not Gasoline"* ........................................................63

b)     EBS's "Plain and Ordinary Meaning" Construction would Divorce the Claims from the Specification ........................................................67

c)     EBS Disclaimed Single-Fuel Engines........................67

iv

B.   **"increases knock suppression by evaporative cooling"** ['965: Claims 1, 14, 17, 19] .................................................. 69

    1.   **Plaintiffs' Opening Position** .................................. 69

    2.   **Defendant's Answering Position** ............................. 70

    3.   **Plaintiffs' Reply Position** ..................................... 72

    4.   **Defendant's Sur-Reply Position** ............................ 73

C.   **[where open loop control is] "used during transients in engine load"** ['965: Claims 1, 14, 19] / **[wherein the fuel management system is configured to use open loop control during] "transients in torque"** ['760: Claim 25] ........................... 73

    1.   **Plaintiffs' Opening Position** .................................. 73

    2.   **Defendant's Answering Position** ............................. 74

    3.   **Plaintiffs' Reply Position** ..................................... 76

    4.   **Defendant's Sur-Reply Position** ............................ 77

D.   **"fuel from the first fueling system is introduced when the engine torque is above a selected value"** ['965: Claim 4] / **"selected value of torque at which the first fueling system is also employed"** ['965: Claim 12] .................................................. 77

    1.   **Plaintiffs' Opening Position** .................................. 77

    2.   **Defendant's Answering Position** ............................. 78

    3.   **Plaintiffs' Reply Position** ..................................... 81

    4.   **Defendant's Sur-Reply Position** ............................ 82

E.   **"end gas"** ['760: Claim 18, 20] ........................................... 82

    1.   **Plaintiffs' Opening Position** .................................. 82

    2.   **Defendant's Answering Position** ............................. 83

    3.   **Plaintiffs' Reply Position** ..................................... 86

    4.    **Defendant's Sur-Reply Position** ...............................................86

F.    **"spark ignition engine"** ['965: Claim 1, 14, 17, 19; '580: Claims 1, 13, 23; '760: Claims 1, 13, 21, 29] .....................................86

    1.    **Plaintiffs' Opening Position** .................................................86

    2.    **Defendant's Answering Position** ...........................................88

    3.    **Plaintiffs' Reply Position** .....................................................92

    4.    **Defendant's Sur-Reply Position** ...............................................93

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*ADE Corp. v. KLA-Tencor Corp.*,
   252 F. Supp. 2d 40 (D. Del. 2003) .......................................................85

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
   265 F.3d 1294 (Fed. Cir. 2001) ............................................58, 59, 67

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
   299 F.3d 1336 (Fed. Cir. 2002) ........................................................89

*Amgen Inc. v. Mylan, Inc.*,
   No. 2:17-cv-01235, 2018 WL 6061213 (W.D. Pa. Nov. 20, 2018) ..................81

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) ........................................................38

*Avid Tech., Inc. v. Harmonic, Inc.*,
   812 F.3d 1040 (Fed. Cir. 2016) ........................................................58

*Baxalta Inc. v. Genentech, Inc.*,
   972 F.3d 1341 (Fed. Cir. 2020) ........................................................53

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010) ........................................................34

*Bell Atl. Network Servs. v. Covad Commc'ns Grp.*,
   262 F.3d 1258 (Fed. Cir. 2001) ........................................................35

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) ........................................................39

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) ........................................................89

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ........................................................79

*Chef Am., Inc. v. Lamb Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ........................................................77

*Colgate-Palmolive Co. v. Ranir L.L.C.*,
2007 WL 2225888 (D. Del. July 31, 2007) ......................................................76

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ..................................................................26, 57

*CVI/Beta Ventures, Inc. v. Tura LP*,
112 F.3d 1146 (Fed. Cir. 1997) ......................................................................75

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019) ......................................................................67

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ......................................................................74

*Ethanol Boosting Systems, LLC v. Ford Motor Company*,
831 F. App'x 505 (Fed. Cir. 2020) ............................................................32, 33

*Genentech, Inc. v. Amgen Inc.*,
2019 WL 2493446 (D. Del. June 14, 2019) ........................................28, 52, 91

*Genentech, Inc. v. Amgen Inc.*,
2019 WL 2502932 (D. Del. June 17, 2019) ............................................87, 91

*Georgetown Rail Equip. Co. v. Holland L.P*,
867 F.3d 1229 (Fed. Cir. 2017) ......................................................................89

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) ............................................................18, 50, 62

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
909 F.2d 1464 (Fed. Cir. 1990) ......................................................................71

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*,
222 F.3d 951 (Fed. Cir. 2000) ........................................................................75

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ......................................................................35

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ......................................................................70

*Huber Engineered Woods LLC v. Louisiana-Pacific Corp.*,
2020 WL 5132922 (D. Del. Aug. 31, 2020)...................................................90, 91

*K–2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999) .........................................................................77

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ...........................................................................66

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
572 U.S. 915 (2014)....................................................................................69, 72

*Linear Tech. Corp. v. ITC*,
566 F.3d 1049 (Fed. Cir. 2009) .........................................................................58

*Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*,
66 F.3d 285 (Fed. Cir. 1995) .............................................................................39

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
959 F.3d 1091 (Fed. Cir. 2020) .........................................................................33

*Microchip Tech. Inc. v. Aptiv Servs. US, LLC*,
2019 WL 2502417 (D. Del. June 17, 2019) .................................................91, 93

*N. Am. Container v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) .........................................................................39

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
903 F.3d 1365 (Fed. Cir. 2018) ...................................................................28, 48

*Nokia Sols. & Networks US LLC v. Huawei Techs. Co.*,
2017 WL 2226413 (E.D. Tex. May 19, 2017) .............................................78, 79

*Northrop Grumman Corp. v. Intel Corp.*,
325 F.3d 1346 (Fed. Cir. 2003) .......................................................48, 55, 65, 66

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .........................................................................67

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006) ...................................................................35, 60

*One-E-Way, Inc. v. ITC*,
  859 F.3d 1059 (Fed. Cir. 2017) .......................................................................64

*Openwave Sys. v. Apple Inc.*,
  808 F.3d 509 (Fed. Cir. 2015) .........................................................................36

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) .......................................................................68

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) .......................................................................52

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
  778 F.3d 1021 (Fed. Cir. 2015) .......................................................................90

*ParkerVision, Inc. v. Qualcomm Inc.*,
  903 F.3d 1354 (Fed. Cir. 2018) ..................................................................55, 65

*Persion Pharms. LLC v. Alvogen Malta Operations LTD.*,
  945 F.3d 1184 (Fed. Cir. 2019) ..................................................................70, 72

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................76, 84, 85

*Presidio Components, Inc. v. AVX Corp.*,
  825 F. App'x 909 (Fed. Cir. 2020) ...................................................................46

*Profectus Tech. LLC v. Huawei Techs. Co.*,
  823 F.3d 1375 (Fed. Cir. 2016) ..................................................................61, 85

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
  739 F.3d 1367 (Fed. Cir. 2014) .......................................................................86

*Saffran v. Johnson & Johnson*,
  712 F.3d 549 (Fed. Cir. 2013) .........................................................................39

*In re Schreiber*,
  128 F.3d 1473 (Fed. Cir. 1997) .......................................................................71

*Sextant Avionique, S.A. v. Analog Devices, Inc.*,
  172 F.3d 817 (Fed. Cir. 1999) .........................................................................85

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
    753 F.3d 1291 (Fed. Cir. 2014) ........................................................45

*Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*,
    2020 WL 3048175 (D. Del. June 8, 2020) ......................................26

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
    522 F.3d 1279 (Fed. Cir. 2008) ........................................................93

*Tabletop Media, LLC v. AMI Entm't Network, LLC*,
    2018 WL 2949467 (D. Del. June 13, 2018) ......................................71

*Techtronic Indus. Co. v. ITC*,
    944 F.3d 901 (Fed. Cir. 2019) ........................................................37

*TomTom, Inc. v. Adolph*,
    790 F.3d 1315 (Fed. Cir. 2015) ........................................................94

*TQ Delta, LLC v. 2wire, Inc.*,
    2018 WL 4062617 (D. Del. Aug. 24, 2018) ...............................90, 93

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
    728 F.3d 1309 (Fed. 2013) .....................................................19, 22, 46

*TriStrata, Inc. v. Microsoft Corp.*,
    594 F. App'x 653 (Fed. Cir. 2014) ...................................................83

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ........................................................84

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016) ........................................................35

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ........................................................16

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................33, 84

*Wang Labs., Inc. v. AOL, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999) ...................................................39, 67

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  2018 WL 3038515 (D. Del. June 19, 2018) ...........................................90, 91, 93

**Statutes**

35 U.S.C. § 112 ..........................................................................................................75

Pursuant to Paragraph 16 of the Court's Scheduling Order (D.I. 15), Plaintiffs Ethanol Boosting Systems, LLC and the Massachusetts Institute of Technology and Defendant Ford Motor Company (collectively, "the Parties") file this Joint Claim Construction Brief setting forth each side's position on the six groups of terms/phrases that Ford has identified for construction.

The Parties also submit a separate Joint Appendix with text-searchable PDFs of each of the following documents:

| Ex. | Document Description |
|-----|----------------------|
| 1. | U.S. Patent Application No. 11/100,026 (the "'026 App.) |
| 2. | U.S. Patent Application No. 10/991,774 (the "'774 App.) |
| 3. | U.S. Patent No. 9,708,965 |
| 4. | U.S. Patent No. 10619580 |
| 5. | U.S. Patent No. 10781760 |
| 6. | '026 App. File History |
| 7. | '774 App. File History |
| 8. | *Ford I* Ford IPR Petition, '166 Patent (Oct. 16, 2019) |
| 9. | *Ford I* Markman Hearing Transcript (Jan. 8, 2020) |
| 10. | *Ford I* Ford Invalidity Contentions (Aug. 30, 2020) |
| 11. | John Heywood, INTERNAL COMBUSTION ENGINE FUNDAMENTALS (1998) |
| 12. | U.S. Patent No. 7,370,634 to Ford |
| 13. | *Ford I* – D.I. 110-11, Car & Driver Article RE: Port & Direct Injection |
| 14. | Email with Ford (2020-12-04) |
| 15. | U.S. Patent No. 9,708,972 to Ford |
| 16. | U.S. Patent No. 6,820,599 to Ford |
| 17. | Declaration of Gregory Shaver (Dec. 21, 2020) |
| 18. | U.S. Patent No. 9,476,375 to Ford |
| 19. | *Ford I* Ford Markman Slides |
| 20. | U.S. Patent No. 8,833,058 to Ford |
| 21. | U.S. Patent No. 8,166,952 to Ford |
| 22. | C.F. Taylor et al., THE INTERNAL COMBUSTION ENGINE (1962) |

| 23. | Plaintiffs' First Amended Infringement Contentions |
|-----|----------------------------------------------------|
| 24. | EBS Suppl. Interrogatory No. 1, 15 Responses |
| 25. | '157 App. File History |
| 26. | U.S. Patent No. 8,069,839 |
| 27. | U.S. Patent No. 7,225,787 |
| 28. | Transcript of the Deposition of Mr. Neil E. Hannemann, August 12, 2020, IPR2019-01399 |
| 29. | '125 App. File History |
| 30. | D.I. 109 Joint Claim Construction Opening Brief |
| 31. | '100 App. File History |
| 32. | Clark Decl. to Ford IPR2020-00010 (166 Patent) |
| 33. | 2019-11-25 EBS Order |
| 34. | Pulkrabek, ENGINEERING FUNDAMENTALS OF THE INTERNAL COMBUSTION ENGINE (1997) |
| 35. | Supplemental Declaration of Gregory Shaver (Jan. 26, 2021) |

2

## I. BACKGROUND

### 1. **Plaintiffs' Opening Statement**

Plaintiffs assert three patents in this action: U.S. Patent Nos. 9,708,965 (the "'965 Patent"), 10,619,580 (the "'580 Patent"), and 10,781,760 (the "'760 Patent") (collectively, the "Bromberg Patents"). Each patent expressly discloses exactly what Ford argued was missing in the prior action ("*Ford I*"): an engine (1) where <u>the same fuel</u> is both direct injected and port injected and (2) <u>gasoline alone</u> is direct injected.

Indeed, in *Ford I* and its related IPR proceedings, Ford <u>itself</u> argued that the specification each Bromberg Patent includes (the "Bromberg Specification") was different from the *Ford I* specification, and that the inventors had amended the *Ford I* specification specifically "to provide written description support for **these single fuel claims**," including **to recite using "gasoline direct injection (GDI), while at the same time port-fuel injecting a fraction of the gasoline**." Ex. 8 ('166 IPR Petition) at 10-11 n.10.[1] In short, Ford argued that the Bromberg Specification discloses exactly what this Court found the *Ford I* patents did not: embodiments in which the same fuel (including gasoline) is both direct and port injected. Having convinced the Court of its position in *Ford I*, however, Ford now reverses course and asks this Court to construe the Bromberg Patents to exclude the very

---

[1] Unless otherwise noted, all emphasis in this brief has been added.

embodiments Ford previously said the Bromberg Specification disclosed. The Court

should reject Ford's arguments.

      a)     <u>Relationship to the Ford I Patents</u>

In *Ford I*, Plaintiffs asserted four different patents (the *Ford I* patents) against

Ford. As depicted below, the *Ford I* patents continued directly from the '774

Application and shared a common specification.



In contrast, the Bromberg Patents continue from U.S. Patent Application No.

11/100,026 (the "'026 Application") (attached as Exhibit 1), which continues-<u>in-part</u>

from the '774 Application and thus contains a different specification.[2]

---

[2] For ease of reference, Plaintiffs' citations to the specification include citations to both the'026 Application ("Bromberg Specification") (Ex. 2) and parallel citations to the corresponding column and line numbers of the '965 Patent (Ex. 3).

b)   The Crux of This Case

In *Ford I*, this Court concluded that the specification in the *Ford I* patents did not disclose the direct injection of gasoline alone. Ex. 9 (*Ford I* Markman Tr.) at 19:13-20:11. The Court thus construed the "fuel that is directly injected" terms at issue in *Ford I* to require "a fuel [1] that contains an anti-knock agent that is not gasoline, and [2] that is different from the fuel used for port injection/in the second fueling system." *Ford I*, D.I. 140 at 1-2.[3]

Ford now argues that these same two *Ford I* limitations should be applied to the Bromberg Patents. For at least three reasons, Ford is wrong.

**First**, the Court should not apply either *Ford I* limitation because the Bromberg Specification contains the exact disclosures that this Court found absent in *Ford I*: embodiments that direct and port inject the same fuel. As the Bromberg Specification explains:

> In order to obtain the highest possible octane enhancement while still maintaining combustion stability, **it may be useful for 100% of the fuel to come from ethanol with a fraction being port injected**, as an alternative to a small fraction of the port-fueled gasoline.

Ex. 1 at 4:6-8; Ex. 3 ('965 Patent) at 3:22-26.

---

[3] The Court's construction was affirmed by the Federal Circuit on December 11, 2020.

Further, notwithstanding the fact that ethanol embodiments are preferred from a pure knock-prevention perspective, the Bromberg Specification recognizes that there are drawbacks to using ethanol, including its "availability and cost." *Id*. at 19:16-19. The Bromberg Specification thus discloses that it may be advantageous to direct and port inject <u>gasoline alone</u>—explaining that such dual-injection of gasoline allows an engine to realize a "cooling effect" that allows it to operate at "higher loads and higher torques" than engines fueled only by port injection of gasoline:

> [I]n some cases a means of operating the vehicle at higher loads would be desired. This could be accomplished by using gasoline in the ethanol system with **gasoline direct injection (GDI), while at the same time port-fuel injecting a fraction of the gasoline**.

Ex. 1 at 17:5-8; Ex. 3 ('965 Patent) at 12:24-28.

**Second**, the Court should not apply either *Ford I* limitation here because the Bromberg claims expressly recite the direct and port injection of the same fuel, including gasoline. For example, Claims 12, 14, 21, and 31 of the '580 Patent recite:

> The fuel management system of claim 1[/13], wherein the fuel management system is configured to introduce **gasoline** <u>into the engine by the first fueling system</u> **and** <u>by the second fueling system</u>.

Ex. 4 at 18:7-10, 19:15-18. Claims 11, 20, 28, and 33 of the '760 Patent do the same—explaining the "the first [direct] fueling system is configured to introduce gasoline into the spark ignition engine and the second [port] fueling system is configured to introduce gasoline into the spark ignition engine." Ex. 5 at 18-22.

Finally, **third**, the Court should not apply the same construction because Ford itself has confirmed that the Bromberg Patents disclose these same-fuel and gasoline-only embodiments. Ford repeatedly represented in its August 30, 2019 *Ford I* invalidity contentions and in its October 16, 2019 *Ford I* IPR petitions that the Bromberg Specification discloses both same-fuel and gasoline-only embodiments. And these were not one-off statements. Ford **conceded more than 50 times** in its *Ford I* district court invalidity contentions and IPR petitions that the Bromberg Specification disclosed same-fuel and gasoline-only embodiments. Ex. 10 (*Ford I* Contentions) (concessions highlighted); Ex. 8 ('166 IPR Petition) (same).

For example, Ford told the PTAB that the Bromberg Specification discloses embodiments that port and direct inject <u>the same fuel</u>, including <u>gasoline only</u>:

> Bromberg discloses that an anti-knock agent **or gasoline can be directly injected into the engine**. Bromberg also discloses that **gasoline can be port injected into the engine**.

Ex. 8 ('166 IPR Petition) at 21 (internal citation omitted). Ford said the same in its *Ford I* contentions:

> **Gasoline can also be directly injected**. Bromberg, claim 1. **Bromberg also discloses that gasoline is port injected** into the cylinder of the engine.

Ex. 10 (*Ford I* Contentions) at 58.

Ford did not stop there. Ford also repeatedly explained that a POSITA would understand that—while not as effective as ethanol embodiments—gasoline-only

7

dual-injection embodiments realize an anti-knock cooling effect high enough to justify their use of gasoline-only direct and port injection:

> While the disclosure is directed to ethanol or an antiknock agent, **Bromberg also discloses using directly injected gasoline would have a cooling effect** such that directly injected gasoline would be employed even in the absence of ethanol for knock avoidance.

*Id*. at 67.

> "Only the cooling effect of the direct injection fuel is obtained, **since the directly injected fuel has the same octane number as the port-injection fuel (gasoline in both cases)**." In other words, Bromberg specifically discloses directly injecting gasoline for a cooling effect.

*Id*. at 61 (emphasis added).

As Plaintiffs pointed out in their Complaint, Ford's representations were one of the reasons Plaintiffs asserted the Bromberg Patents after the Court issued its *Ford I* claim construction order. Simply put, Plaintiffs understood that the parties agreed that the Bromberg Specification disclosed everything this Court held the *Ford I* patents lacked.

### c)   The Patented Invention

The inventors of the Asserted Patents have spent much of their lives improving engines. Professor Heywood was the Director of the Sloan Automotive Laboratory and literally wrote the INTERNAL COMBUSTION ENGINE FUNDAMENTALS (1988) textbook used as a primer on the operation of internal combustion engines. Ex. 11.

Dr. Bromberg and Dr. Cohn likewise are internationally known for their work on spark ignition engines and fuel management technologies.

Consistent with this focus, the Bromberg Patents improve over the prior art by disclosing spark ignition engines and fuel management systems that use new combinations (and configurations) of two different fuel injection techniques: (1) port fuel injection ("PFI") and (2) direct injection ("DI"). Ex. 1 (Bromberg Specification) at 4:16-27, 6:5-8; Ex 2 ('965 Patent) at 3:38-59; 4:42-56.

Briefly explained, port injection is the term used to describe the "injection of fuel into an intake port or intake manifold" outside of an engine cylinder, which was the main used technique used at the time of the Bromberg Specification's filing. *See* Joint Chart, D.I. 41 at 2-3 (Agreed Construction #1). In contrast, direct injection techniques inject fuel directly into a cylinder. An exemplary depiction of such techniques and their combined use in a "dual injection" engine is shown below.



Ex. 13 at 1.

As the Bromberg Specifications explain, each of these fuel injection techniques has known advantages and disadvantages. Among other advantages, port injection allows for better fuel mixing and "combustion stability," which increase efficiency and reduce emissions. Ex. 1 at 3:29-30, 4:6-8, 10:9-10; Ex. 3 ('965 Patent) at 3:9-13; 3:22-26; 7:18-20. In contrast, the use of direct injection in a spark ignition engine can provide "charge" or "evaporative" cooling of the in-cylinder air-fuel mixture, which allows an engine to better avoid unwanted autoignition (i.e., "knock"). Ex. 1 at 15:4-6; *id*. at 7:13-22 (discussing Table 2); *see* Ex. 3 ('965 Patent) at 10:59-62, 6:21-34. This increased knock resistance allows the engine to operate at higher torques and loads and/or compression ratios and provide increased efficiency.

10

As such, the Bromberg Patents and claims are directed to control techniques that enable the combined use of both injection techniques—allowing an engine to realize the better mixing and combustion stability advantages of port injection along with the higher knock resistance benefit of direct injection. For example, the Bromberg Specification explains that direct injection can be increased as a result of a signal from a knock detector or "when the engine torque is above a selected value or fraction of the maximum torque." Ex. 1 at 1:30-2:3, 13:19-20; Ex. 3 ('965 Patent) at 1:54-59, 9:56-58.

The Bromberg Specification also explains that a variety of fuels may be directly injected. For example, it recognizes the high knock suppression benefit of ethanol—explaining that, "to obtain the highest possible octane enhancement while still maintaining combustion stability, it may be useful for 100% of the fuel to come from ethanol with a fraction being port injected," i.e., to direct and port inject 100% ethanol. Ex. 1 at 4:6-8; Ex. 3 ('965 Patent) at 3:22-26.

However, the Bromberg Patents recognize that fuel that contains a preferred anti-knock agent like ethanol is not always available or economical. Ex. 1 at 16:5-6, 21:16-21, 22:19-24; Ex. 3 at 11:43-45, 15:44-52, 16:41-49. The patents thus teach that—while the degree of anti-knock benefit is "far below what ethanol could achieve"—"gasoline direct injection (GDI), while at the same time port-fuel injecting a fraction of the gasoline," can be used to achieve the "desired" result of

operating without knock at "higher loads and higher torques" than gasoline port injection only embodiments. *Id.* at 17:5-11; *id.* at 15:29-30 ("[T]he heat of vaporization of gasoline is also useful in decreasing the temperature of the charge in the cylinder."); Ex. 3 ('965 Patent) at 12:24-34, 11:31-33. This gasoline-only dual-injection embodiment thus is an important improvement over traditional single-injection embodiments—one that avoids the availability and cost drawbacks of using ethanol while simultaneously allowing the engine to realize the anti-knock "cooling effect" realized by directly injecting gasoline alone. Ex. 1 at 17:10-11; Ex. 3 ('965 Patent) at 12:31-34.

Consistent with the above disclosure, Table 3 thus identifies the "[a]nti-knock properties of various fuels," including the direct injection of "Gasoline," which it states confers a 28K evaporative cooling benefit. Ex. 1 at 21:1-6; Ex. 3 ('965 Patent) at 15:1-26. Table 3 also identifies a measure of the anti-knock benefit of directly injected gasoline; "the ratio[] of the heat of vaporization to the heat of combustion [of gasoline], a measure of the potential effects when used as [an] antiknock agent[]."Ex. 1 at 21:5-6; Ex. 3 at 26-28.

These disclosures show the enhanced knock resistance benefit realized by direct injection of gasoline, which the Bromberg Specification describes as one of the "proposed fuel antiknock/alternative fuels." Ex. 1 at 20:13-14; Ex. 3 at 14:45-47. Ford itself argued in its *Ford I* invalidity contentions that, in discussing potential

12

directly injected fuels, "**Bromberg speaks to alternatives to ethanol, including gasoline [as] shown in Table 3**." Ex. 10 (*Ford I* Contentions) at 62. The Bromberg Specification also teaches that "gasoline-ethanol mixtures" can be used. Ex. 1 at 20:6-8; Ex. 3 ('965 Patent) at 14:33-35.

In short, the Bromberg Patents are not limited to the use of certain fuels or to the use of different fuels in the port fuel injectors and direct injectors. And as Ford itself argued in *Ford I*, the same control approach disclosed for direct injection of ethanol can be used for direct injection of gasoline alone:

> As discussed above, Bromberg also discloses using gasoline for direct injection. A person of ordinary skill in the art would understand that **Bromberg discloses using the same control approach when gasoline is directly injected as when ethanol is directly injected**.

Ex. 10 (*Ford I* Contentions) at 132.

### 2. **Ford's Answering Statement**

Just over a year ago, this Court construed the "directly injected fuel" terms in the *Ford I* patents as "a fuel that contains an anti-knock agent that is not gasoline, and that is different from the fuel used for port injection in the second fueling system." (*Ford I*, D.I. 140, 1–2). Immediately thereafter, EBS stipulated to a judgment that Ford's engines did not infringe the *Ford I* patents "under the Court's construction." (*Ford I*, D.I. 142, ¶ 7). EBS appealed to the Federal Circuit. On December 11, 2020, the Federal Circuit issued a Rule 36 affirmance of this Court's

13

construction. Nevertheless, EBS now relitigates the same issue. EBS's position should be rejected for three reasons.

First, EBS has conceded that the invention described by the Bromberg Patents is the same one described by the *Ford I* patents. While EBS argues in its claim construction brief that the invention described in the Bromberg Patents is different than the invention described by the *Ford I* patents, it has taken the opposite position when addressing priority. Namely, EBS claims priority to the 2004 application that has the same specification as the *Ford I* patents, asserting that the 2004 application describes the inventions claimed in the Bromberg Patents. Because this Court and the Federal Circuit have already held that the 2004 application excluded single-fuel engines, if EBS is entitled to a 2004 priority date, the Bromberg Patents must also exclude single-fuel engines.

Second, the entirety of the intrinsic record demonstrates that the Bromberg Patents are directed to dual-fuel engines, just like the *Ford I* patents. While the specification of the Bromberg Patents may use different words than the specification of the *Ford I* patents, at bottom, the Bromberg Patents still describe dual-fuel engines, and only dual-fuel engines, as the invention. For example, the Bromberg Patents are titled "Optimized Fuel Management System for Direct Injection Ethanol Enhancement of Gasoline Engines." The "Background of the Invention" similarly describes the patents as disclosing "approaches for optimizing direct injection

14

ethanol enhanced knock suppression" and repeatedly emphasizes that the invention relates to approaches for directly injecting ethanol. (Ex. 3 ('965 Patent), 1:24–53, 3:37–58). The remainder of the specification and prosecution history confirms this. In fact, during prosecution, the patent applicants expressly stated that the invention related to dual-fuel, as opposed to single-fuel, engines. Thus, the same construction adopted in *Ford I* for "directly injected fuel" and its variants should be adopted here.

Third, the portions of the specification that EBS relies on are taken out of context and/or mischaracterized, as are the statements from Ford that EBS relies on. As explained below, the portions of the specification that EBS points to actually demonstrate that the fuel systems are designed as dual-fuel systems. The statements of Ford that EBS cites are the same. The cited statements are taken out of context and contorted into something they are not. Nowhere did Ford say that what Bromberg describes as its invention is single-fuel engines.

### 3. **Plaintiffs' Reply Statement**

Because of the many aspects of the Bromberg Patents and the issues Ford raises, Plaintiffs begin by re-focusing on the "directly injected fuel" terms and Ford's attempts to artificially limit them by narrowly defining them to require "[1] a fuel that contains an anti-knock agent that is not gasoline, and [2] that is different from the fuel used for port injection in the second fueling system." Ford's attempts should be rejected.

15

Ford's construction would improperly exclude embodiments disclosed in the Bromberg specification and dependent claims, contrary to accepted claim construction principles. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification." (citation omitted)). Ford's construction would also require ignoring Ford's prior representations and expert testimony before both this Court and the PTAB.

In fact, Ford's "same fuel" limitation (limitation 2) would improperly exclude at least <u>three</u> embodiments of the Bromberg Patent's claimed fuel management systems including:

> (1) embodiments disclosed in the specification where directly injected ethanol is used, and where "100% of the fuel" controlled by the claimed fuel management system comes "from ethanol <u>with a fraction being port injected, as an alternative to a small fraction of the port-fueled gasoline</u>,"
>
> (2) embodiments covered by dependent claims where the claimed fuel management system is configured to control <u>gasoline/gasoline injection</u>; and
>
> (3) embodiments disclosed in the specification where the claimed fuel management system is configured to control <u>gasoline/gasoline injection</u> in the <u>absence of ethanol</u>.

Ford's "not gasoline" limitation likewise would improperly exclude at least embodiments (2) and (3) above from the claimed invention.

16

Ford cannot escape the impact of its own prior admissions and expert testimony that Bromberg discloses systems configured to port- and direct-inject the same fuel, including gasoline only. Ford's admissions include:

> Bromberg discloses that an anti-knock agent or gasoline can be directly injected into the engine. Bromberg also discloses that gasoline can be port injected into the engine.

Ex. 8 ('166 IPR Petition) at 21 (internal citation omitted).

> Gasoline can also be directly injected. Bromberg, claim 1. Bromberg also discloses that gasoline is port injected into the cylinder of the engine.

Ex. 10 (*Ford I* Invalidity Contentions) at 58.

> Only the cooling effect of the direct injection fuel is obtained, since the directly injected fuel has the same octane number as the port-injection fuel (gasoline in both cases)." In other words, Bromberg specifically discloses directly injecting gasoline for a cooling effect.

*Id.* at 61 (internal citation omitted).

Ford also does not attempt to explain its prior argument that the inventors amended the *Ford I* specification specifically "to provide written description support for these single fuel claims" in the Bromberg Specification. Ex. 8 ('166 IPR Petition) at 10-11 & n.10. Ford fails to explain its expert's testimony that the Bromberg Specification anticipates (and thus must disclose) "a system where the same fuel from the same fuel source is both direct injected and port injected." Ex. 32 (Clark Decl.) at 65, 83 (stating that the Bromberg Specification anticipated because, among

17

other things, it discloses that "gasoline can be directly injected" and that "gasoline may be port injected").

Ford is wrong that its prior admissions are irrelevant. As the Federal Circuit has explained, an accused infringer's statements regarding a patent or a claim term's scope is direct, compelling evidence of how "those skilled in the art would construe the claims." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005). *Gillette* is directly on point. Noting that "[t]he defendant itself endorsed" that the asserted patent family "would not exclude" a particular feature, the Federal Circuit explained that "[t]his blatant admission by this same defendant" clearly demonstrated that "those skilled in the art would construe the claims" to encompass the claimed feature. *Id*. Ford's "blatant admission[s]" here are even more compelling because they concerned the very Bromberg Specification now at issue.

Ford's "**same fuel from the same fuel source**" and "**gasoline in both cases**" concessions are just the tip of the iceberg. Ford made more than more than **50** distinct admissions that the Bromberg Specification discloses everything this Court concluded the *Ford I* specification did not. Tellingly, Ford ignores all but a handful of these in its response.

Finally, none of Ford's three attempts to disregard its own prior admissions has any merit.

First, Ford argues that Plaintiffs "conceded that the invention described by the Bromberg Patents is the same one described by the *Ford I* patents" by arguing that the Bromberg Patents are entitled to the priority date of the 2004 *Ford I* application. But as this Court explained to Ford, priority date is determined under a written description inquiry, <u>which this Court never undertook in the prior *Ford I*</u>. *See Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1319 (Fed. 2013); Ex. 33, at 6 (November 25, 2019 Order) (explaining the standard before concluding that "Ford's [priority-date related] objections bordered on frivolous").

The Court simply construed claims—an inquiry governed by a different (and in many ways narrower) standard. In fact, the standards are so different that the Federal Circuit has held that a prior "ruling on claim construction does not govern the written description inquiry" even for "continuation" patents where the specification is exactly the same. *Trading Techs.*, 728 F.3d at 1319 ("[C]laim construction and the written description requirement are separate issues that serve distinct purposes.").

Second, Ford argues that the Bromberg Patents merely "use different words" to disclose the "same" invention as the *Ford I* patents. Also wrong. As continuations-in-part, the Bromberg Patents add "substantial new matter relative to the original written description." *Trading Techs.*, 728 F.3d at 1312. In fact, <u>in this case</u>, Ford argued that "the Newly Asserted [Bromberg] Patents, as continuations-in-part, have

additional disclosures compared to the Previously Asserted [*Ford I*] Patents." D.I. 24 at 3. And critically, this "new matter" includes fueling systems in which the same fuel is both port and direct injected.

Finally, Ford boldly asserts that Plaintiffs "take[] out of context and/or mischaracterize[]" the Bromberg Specification and Ford's admissions—challenging Plaintiffs to identify anywhere in the Bromberg Specification or Ford's prior statements describing the invention as encompassing "single-fuel" embodiments. It is not much of a challenge. The Bromberg Specification expressly discloses single-fuel embodiments, including embodiments that direct and port inject 100% ethanol, 100% gasoline, or various fuel mixtures (e.g., "gasoline-ethanol mixtures, such as E85"). Ex. 1 at 4:6-8, 17:3-11, 20:6-8; Ex. 3 ('965 Patent) at 3:22-26, 12:20-34, 14:33-35. Further, Ford admitted in its prior filings that the Bromberg Specification discloses "single fuel claims," Ex. 8 ('166 IPR Petition) at 10-11 & n.10, including a system where the <u>same fuel is both direct and port injected</u>, Ex. 32 (Clark Decl.) at 65, 83.

In sum, as Ford previously admitted, the Bromberg Specification contains the "same fuel" and directly injected gasoline disclosures that this Court found the *Ford I* specification lacked. And those disclosures demonstrate that Ford's "different fuels" and "anti-knock agent that is not gasoline" limitations are wrong.

### 4. **Ford's Sur-Reply Statement**

The specification leaves no doubt that the invention and the claims describe engines designed to inject different fuels through direct and port injection fueling systems. The entirety of the specification, including the figures, is devoted to the operation of this dual-fuel type engine. EBS argues that Ford's construction excludes certain "modes of operation." But EBS ignores that all Asserted Claims are apparatus claims, not method claims. When the specification explains that the engine may run on 100% ethanol at certain points in the engine cycles, this does not transform the dual-fuel engine apparatus into a single-fuel engine. The engine still must be structurally configured to use two fuels, from two different sources. Similarly, when the specification teaches that gasoline alone may be used when ethanol is exhausted, the ethanol must have been present in the first place and the engine must have been designed to use it. Ford's construction neither contradicts these disclosures nor excludes these two "modes."

Instead of focusing on the disclosures of the intrinsic record, EBS cherry picks statements out of context from IPRs concerning the *Ford I* patents. At its most egregious, EBS points to a statement about ***EBS's*** proposed construction of the *Ford I* patents, not statements by Ford. The other passages EBS cites merely acknowledge that Bromberg discloses that: (i) a mixture of antiknock agent and gasoline can be directly injected; or (ii) when "ethanol is exhausted," gasoline can be direct and port

21

injected. These positions are entirely consistent with Ford's statements here. None of the passages state Bromberg is directed to a single fuel engine.

EBS offered no coherent response to Ford's argument that EBS's claim to a 2004 priority date based on the *Ford I* specification is an admission that the "directly injected fuel (and variants thereof)" terms, which are substantially the same in both sets of patents, should have the same construction. EBS relies on *Trading Techs. Int'l v. Open E Cry*, but the facts in *Open E Cry* are readily distinguishable from those here. There, the Federal Circuit held that a previous claim construction ruling was not dispositive of written description for claims in continuation patents where the construed language was ***removed***. In contrast, Plaintiffs point to no meaningful difference between the claim language here and from the *Ford I* patents, while nevertheless relying on the *Ford I* specification to support a 2004 priority date.

## II.    AGREED-UPON CONSTRUCTIONS

The parties have stipulated to the following constructions:

| Term | Construction |
| --- | --- |
| **"port fuel injection"**<br><br>['965: Claims 13, 16, 18; 580: Claims 1, 13, 23; 760:1, 13, 21, 29] | "injection of fuel into an intake port or intake manifold" |
| **"second fueling system that injects fuel into a region outside of the cylinder"**<br><br>['965: Claims 1, 14, 17, 19] | Plain and ordinary meaning. |

22

| | |
|---|---|
| **"second fueling system that uses port fuel injection"**<br><br> ['580: Claims 1, 13, 23; 760: Claims 1, 13, 21, 29]<br><br>**"increases knock suppression by evaporative cooling"**<br><br>['965: Claims 1, 14, 17, 19] | |
| **"closed loop control that utilizes a sensor that detects knock"**<br><br>['965: Claims 1, 14, 17, 19] | Plain and ordinary meaning. |
| **"range of torque"**<br><br>['965: Claims 1, 11, 14, 17, 19; 580: Claims 1, 13, 23; 760: Claims 1, 13, 21, 29]<br><br>**"torque range"**<br><br>['580: Claims 1, 3-8, 13, 18-20, 23, 25; 760: Claims 1-9, 13, 21, 23, 29, 31] | Plain and ordinary meaning. |
| **"use spark retard to change the fraction of fueling provided by the first fueling system to zero"**<br><br>['580: Claims 16, 30; 760: Claim 15] | "use spark retard so as to reduce to zero the amount of fuel that is provided by direct injection" |
| **"matched to that needed to prevent knock"**<br><br>['965: Claim 9] | Plain and ordinary meaning. |

23

| | |
|---|---|
| **"the minimum needed to prevent knock"**<br><br>['965: Claim 10] | Plain and ordinary meaning. |
| **"to be substantially equal to"**<br><br>['580: Claims 9, 24; 760: Claim 8] | Plain and ordinary meaning. |
| **"are operable throughout"**<br><br>['580: Claims 1, 13, 23; 760: Claims 1, 13, 21, 29]<br><br>**"is operable throughout"**<br><br>['580: Claims 1, 13, 23; 760: Claims 1, 13, 21, 29]<br><br>**"is not operable throughout"**<br><br>['580: Claims 1, 13, 23; 760: Claims 1, 13, 21, 29] | Plain and ordinary meaning. |
| **"variable valve timing is used to decrease the octane requirement of the engine"**<br><br>['965: Claim 5] | Plain and ordinary meaning. |
| **"configured to provide a uniform fuel distribution in at least one cylinder"**<br><br>['760: Claims 10, 24]<br><br>**"configured to provide a uniform distribution of fuel in at least one cylinder"**<br><br>['760: Claim 17] | Plain and ordinary meaning. |

24

| | |
|---|---|
| **"wall wetting"**<br><br>['965: Claim 19]<br><br>**"carried out so as to minimize wall wetting"**<br><br>['965: Claim 19] | Plain and ordinary meaning. |
| **"injected so as to provide non-uniform distribution of fuel in the cylinder"**<br><br>['965: Claim 17] | Plain and ordinary meaning. |
| **"when to provide fueling"**<br><br>['580: Claims 10, 17, 22, 23] | "when to provide fueling from the first fueling system" |
| **"during engine start up"**<br><br>['965: Claim 14] | Plain and ordinary meaning. |
| **"hot gas"**<br><br>['580: Claim 27]<br><br>**"higher temperature gas"**<br><br>['965: Claim 20] | "hot gas" shall be construed as "gas that has been heated by compression after the inlet valve's closure"<br><br>"higher temperature gas" shall be construed as "gas that has been heated by compression after the inlet valve's closure" |

## III.   DISPUTED CLAIM CONSTRUCTIONS

### A.   **"directly injected fuel" (and variants thereof)** ['965: Claims 1, 6, 14, 17, 19, 21; '760: Claims 1, 13, 21, 29; '580: Claims 1, 6, 13, 23]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| "directly injected" means "direct injection of fuel into a cylinder"<br><br>"fuel" should be construed to have its plain and ordinary meaning | "a fuel that contains an anti-knock agent that is not gasoline, and that is different from the fuel used for port injection/in the second fueling system." |

### 1.   **Plaintiffs' Opening Position**

The parties agree that "direct injection" refers to the "direct injection of *fuel* into a cylinder." D.I. 41 at 6 n.2. The parties dispute only whether the invention is limited to directly injecting a certain type of fuel—namely "a fuel [1] that contains an anti-knock agent that is not gasoline, and [2] that is different from the fuel used for port injection/in the second fueling system." It is not.

Because Ford seeks to import a negative limitation into each claim term by excluding certain fuels, Ford must show the specification contains "'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019). Simply put, "[a]bsent 'any express disclaimer or independent lexicography in the written description that would justify adding [a] negative limitation,'" it is improper to "import one." *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, 2020 WL 3048175, at *7 (D. Del. June 8, 2020) (Andrews, J.) (citation omitted). Ford cannot make that showing.

26

Here, however, a simpler basis exists to reject Ford's limitations. As Ford itself has argued, the Bromberg Specification expressly discloses the use of the same fuel in each fueling system. Likewise, as Ford itself has argued, the Bromberg Specification discloses the direct injection of gasoline alone. As such, it would be error to construe the claims to exclude those very embodiments.

        a)      <u>The Bromberg Patents Disclose Embodiments That Use the Same Fuel for Both Direct and Port Injection.</u>

As explained above at pages 5-7, the Bromberg Specification specifically contemplates that <u>the same fuel</u> may be both direct and port injected. Indeed, the Bromberg Specification states that direct and port injection of the same fuel allows for the <u>greatest</u> anti-knock effect "while still maintaining combustion stability":

> [T]o obtain the highest possible octane enhancement while still maintaining combustion stability, **it may be useful for 100% of the fuel to come from ethanol with a fraction being port injected**, as an alternative to a small fraction of the port-fueled gasoline.

Ex. 1 at 4:6-8; Ex. 3 ('965 Patent) at 3:22-26.

The Bromberg Specification also explains that—while not as effective as ethanol—direct and port injection of only gasoline nevertheless is beneficial because it allows a vehicle to "operate at higher loads and higher torques" than traditional port-injection-only engines. Ex. 1 at 17:5-11 (explaining that, in such "gasoline direct injection (GDI)" embodiments," "<u>the directly injected fuel has the same</u>

octane number as the port-injection fuel (**gasoline in both cases**)"); Ex. 3 ('965 Patent) at 12:24-34.

Consistent with these disclosures, the claims recite same-fuel embodiments. For example, as explained above at page 6, Claims 12 and 21 of the '580 Patent recite a "fuel management system … configured to introduce **gasoline** into the engine by the first fueling system **and** by the second fueling system." Ex. 4 at 18:7-10, 19:15-18. As also explained at page 6, Claims 14 and 31 of the '580 Patent and Claims 11, 20, 28, and 33 of the '760 Patent do the same.

Nothing more is needed to reject Ford's second "different fuel" limitation. The Federal Circuit has "cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meanings consistent with the intrinsic record." *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018). And this Court has refused to adopt constructions that "conflict[] with the plain language of the claim." *Genentech, Inc. v. Amgen Inc.*, 2019 WL 2493446, at *9 (D. Del. June 14, 2019) (Connolly, J.).

Nevertheless, there is yet another reason to reject Ford's "different fuel" limitation: Ford itself argued that the Bromberg Specification discloses same-fuel embodiments. As detailed at length above at pages 7-8, Ford repeatedly told the PTAB that the Bromberg Specification discloses the port and direct injection of the same fuel, including gasoline only:

> Bromberg discloses that an anti-knock agent **or gasoline can be directly injected into the engine**. Bromberg also discloses that **gasoline can be port injected into the engine**.

Ex. 8 ('166 IPR Petition) at 21 (internal citation omitted).

Ford took the same position before this Court in its invalidity contentions—representing that, "[i]n addition to using an antiknock agent, <u>Bromberg also discloses that gasoline can also be used for direct injection</u>" and "specifically discloses directly injecting gasoline for a cooling effect." Ex. 10 (*Ford I* Contentions) at 61. Further, Ford made clear that it understood that this embodiment expressly discloses the same fuel (gasoline) being used in both systems, explaining: "**the directly injected fuel has the same octane number as the port-injection fuel (gasoline in both cases)**.'" *Id.*

In short, both the Bromberg Specification and the Bromberg claims disclose the direct and port injection of the same fuel—exactly what Ford itself argued in *Ford I*. The Court should reject Ford's "different fuel" limitation.

> b) <u>The Bromberg Patents Disclose Embodiments That Direct Inject Only Gasoline.</u>

Ford's "anti-knock agent that is not gasoline" limitation should be rejected for the same reasons as Ford's "different fuel" limitation: it is inconsistent with the Bromberg Specification, the Bromberg claims, and Ford's own prior arguments in its IPR petitions and invalidity contentions.

As explained above at pages 27-29, the Bromberg Specification makes clear that—while direct injection of a fuel that contains some percentage of an anti-knock agent like ethanol is preferred—it is not required. To the contrary, "the heat of vaporization of gasoline is also useful in decreasing the temperature of the charge in the cylinder." Ex. 1 at 15:28-30; Ex. 3 ('965 Patent) at 11:30-32.

As such, the Bromberg Specification states that—while not as effective as ethanol—direct injection of gasoline alone still allows an engine to "operate at higher loads and higher torques" than engines that rely on gasoline port injection alone. Ex. 1 at 17:3-11; Ex. 3 ('965 Patent) at 12:20-34. Thus, Ford argued that "Bromberg speaks to alternatives to ethanol, <u>including gasoline</u> [as] shown in Table 3," as possible directly injected fuels. Ex. 10 (*Ford I* Contentions) at 62.

The claims confirm that understanding. Dependent Claims 12 and 21 of the '580 Patent recite the direct injection of gasoline <u>alone</u>—stating:

> The fuel management system of claim 1[ and 13], wherein the fuel management system is configured to introduce **<u>gasoline</u>** <u>into the engine by the first fueling system</u> **and** <u>by the second fueling system</u>.

Ex. 4 at 18:7-10, 19:15-18. As explained above at page 6, Claims 14 and 31 of the '580 Patent and Claims 11, 20, 28, and 33 of the '760 Patent do the same.

And again, Ford has urged this very same understanding of the Bromberg Specification. Consistent with the disclosure at 17:3-11, *see* Ex. 3 at 12:20-34, Ford

told the PTAB that the Bromberg Specification recites <u>gasoline-only</u> embodiments that direct and port inject the same "gasoline" fuel:

> Bromberg discloses that an anti-knock agent **or gasoline can be directly injected into the engine**. Ex. 1140, 1:13-16, 12:8-15, Claim 1. Bromberg also discloses that **gasoline can be port injected into the engine**. Ex. 1140, 3:5-8.

Ex. 8 ('166 IPR Petition) at 21. Ford took the same position before this Court—arguing in *Ford I* invalidity contentions that, "[i]n addition to using an antiknock agent, Bromberg also discloses that gasoline can also be used for direct injection" and that, in such cases, "<u>the directly injected fuel has the same octane number as the port-injection fuel (gasoline in both cases)</u>.'" Ex. 10 (*Ford I* Contentions) at 61.

Ford also explained why such a gasoline-only embodiment was desirable: because it would allow a vehicle to "operate at higher loads and higher torques" than with gasoline port injection alone. *Id.* "In other words, Bromberg specifically discloses directly injecting gasoline for a cooling effect." *Id.*

In sum, Plaintiffs agree with Ford's stated understanding of the Bromberg Specification and claims: As Ford explained, the Bromberg Specification teaches that the directly injected fuel can be gasoline alone and that such embodiments outperform traditional gasoline port-injection-only embodiments. *Id.* As Ford explained, "Bromberg discloses using the same control approach when gasoline is directly injected as when ethanol is directly injected." *Id.* at 132. And as Ford explained, a POSITA would understand that the invention thus was not limited to

31

embodiments that include an "anti-knock agent that is not gasoline." Ex. 8 ('166 IPR Petition) at 10-11 n.10. Ford should be held to its word.

For each of these reasons, the Court should reject Ford's construction.

### 2. **Defendant's Answering Position**

The Court is familiar with this invention. The Bromberg Patents are continuations-in-part of the applications that led to the patents in *Ford I.* While the disclosure of the Bromberg Patents uses different words, it describes the same dual-fuel engines described in the *Ford I* patents. EBS admits as much by claiming priority for all of the asserted claims to the November 18, 2004 application, which has the specification of the *Ford I* patents. (Ex. 23 (Plaintiffs' First Amended Infringement Contentions), § I(f), at 5); Ex. 24 (EBS Suppl. Interrogatory No. 1, 15 Responses)). This Court previously held that, for this 2004 application, "it's very, very clear that ***the specification in its entirety*** demonstrates that the patent claims are directed to dual-fuel engines." (Ex. 9 (*Markman* Transcript), 19:13–16 (emphasis added)). The Federal Circuit agreed, issuing a Rule 36 affirmance of this Court's construction. *Ethanol Boosting Systems, LLC v. Ford Motor Company*, 831 F. App'x 505 (Fed. Cir. 2020) ("EBS Appeal"). EBS's re-litigation of a construction that was previously settled by both this Court and the Federal Circuit should be rejected.

EBS argues that Ford's construction improperly seeks to import a negative limitation, and that to do so, "Ford must show the specification contains 'expressions

32

of manifest exclusion or restriction, representing a clear disavowal of claim scope.'"
(EBS Opening, 26). First, the legal standard EBS applies is incorrect. EBS advanced
this same legal standard at the Federal Circuit in *Ford I.* During oral argument, Judge
Dyk told EBS's counsel ***three separate times*** that it simply was not the law. (Audio
Recording of Dec. 10, 2020 Oral Argument,[4] Case No. 2020-1472 (EBS Appeal), at
17:42, 18:37, 19:13). Second, Ford is not trying to import a negative limitation into
the claims. Instead, and as described below, Ford's construction seeks to ensure that
the claims are construed in accordance with the claims and the patent applicants'
statements in the intrinsic record—nothing more. *See Vitronics Corp. v.
Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is
always highly relevant to the claim construction analysis. Usually, it is dispositive;
it is the single best guide to the meaning of a disputed term."); *see also McRO, Inc.
v. Bandai Namco Games Am., Inc.*, 959 F.3d 1091, 1097 (Fed. Cir. 2020) ("The
proper claim construction is based not only in the context of the particular claim in
which the disputed term appears, but in the context of the entire patent, including the
specification.") (internal quotations omitted).

---

[4]   The Federal Circuit has made the audio recording of the oral argument available
at: http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20-1472_12102020.mp3

a)   The Language of the Claims Supports Ford's Construction

Like the claims in *Ford I,* the claims here recite a "first fueling system that uses direct injection" and "a second fueling system that uses port injection," or similar variations thereof. (*See, e.g.*, Ex. 3 ('965 Patent), Claim 1; Ex. 4 ('580 Patent), Claim 1; Ex. 5 ('760 Patent), Claim 1). Claim 1 of each of the Bromberg Patents further requires certain fractions of fuel for the first and second fueling systems. Thus, as in *Ford I*, the claims make it clear that there are two different fueling systems that are distinct. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.") (internal quotation marks and alteration omitted)). As described below, when read in view of the specification, it is clear that the fuel that is directly injected contains an anti-knock agent and is different from the gasoline that is port-injected.

b)   The Specification Supports Ford's Construction

The specification of the Bromberg Patents demonstrates that, just like the *Ford I* patents, the Bromberg Patents are directed to dual-fuel engines. The inventors did not invent a new, single-fuel engine. If they had, they could not claim priority to the 2004 application, which covers only dual-fuel engines. Further, the specification text, figures, and title all confirm that the inventions are dual-fuel.

34

The body of the Bromberg Patents begins by stating "*[t]his invention relates to* an optimized fuel management system . . . *in which an anti-knock agent which is a fuel is directly injected* into a cylinder of the engine.*" (Ex. 3 ('965 Patent), 1:20–24 (emphasis added)); *see also Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) ("[T]he patentees defined the [disputed term] by implication, through the term's consistent use throughout [the] specification."); *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("When the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). This is not a one-off statement. The specification throughout uses language describing "this invention" or "the present invention" as directly injecting ethanol or another second fuel that is not gasoline. (*See, e.g.*, Ex. 3 ('965 Patent), 1:64–67; 13:20–22; 16:27–30); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) ("On at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention' . . . The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter."). The title also evidences the dual-fuel nature of the inventions. (*See* Ex. 3 ('965 Patent), Title ("Optimized Fuel Management System for Direct Injection Ethanol Enhancement of Gasoline Engines")); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823 (Fed. Cir.

2016) (affirming claim construction where "[t]he specification repeatedly emphasizes that the invention is directed to a direct-pointing system [and] [t]he title of the invention explicitly states that the invention is an 'Easily-Deployable Interactive *Direct Pointing* System'" (emphasis in original)).

The figures confirm the same. Every figure shows the use of both gasoline and ethanol. (Ex. 3 ('965 Patent), Figs. 1–5). Figures 1, 2A, and 2B show the benefits of "ethanol energy fraction." (Ex. 3 ('965 Patent), Figs. 2A, 2B). Figures 3, 4A, 4B and 5 all show that ethanol is delivered to the engine separately from gasoline. (Ex. 3 ('965 Patent), Figs. 3, 4A, 4B, and 5). Nowhere is a single-fuel embodiment depicted.

The specification also notes that the anti-knock agent and its use provides superior properties to gasoline. (Ex. 3 ('965 Patent), 1:61–63 (emphasis added) ("hav[ing] a heat of vaporization that is *at least twice that of gasoline* or a heat of vaporization per unit of combustion energy that is *at least three times that of gasoline*."); 2:2–5; 8:4–8). It further disparages the use of gasoline only engines. (*See* Ex. 3 ('965 Patent), 5:6–10 ("The increase in the evaporative cooling effect at constant volume relative to that at constant pressure is substantially higher for the case of direct injection of fuels such as ethanol and methanol than is the case for direct injection of gasoline.")). These disclosures support that the inventions are dual-fuel, not single-fuel engines. *See Openwave Sys. v. Apple Inc.*, 808 F.3d 509,

36

517 (Fed. Cir. 2015) ("[I]t is difficult to envisage how, in light of the repeated disparagement of mobile devices with 'computer modules' discussed [in the patent specification], one could read the claims of the patents-in-suit to cover such devices."); *see also Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 909 (Fed. Cir. 2019) (limiting the construction of a claim term where "the entire specification focuses on enabling placement of the passive infrared detector in the wall console, which is both responsive to the prior art deficiency the '319 patent identifies and repeatedly set forth as the objective of the invention.").

While the Bromberg Patents, as continuations-in-part, contain additional ideas, the additional ideas do not include an inventive single-fuel engine. In fact, the Bromberg Patents state that "important additional approaches for ***optimizing direct injection ethanol enhanced knock suppression***" and "approaches [] based in part on more refined calculations of the effects ***of variable ethanol octane enhancement*** using a new computer model" are the newly described features. (Ex. 3 ('965 Patent), 1:24–36). The specification goes on to explain this optimization is obtained, not by reverting to the prior art's use of gasoline alone, but by "different times of injection [of ethanol] and mixtures with port fuel injected gasoline." (Ex. 3 ('965 Patent), 1:37–39). These new disclosures did not change the fact that the inventions cover only dual-fuel engines.

c)   EBS Disclaimed Single-Fuel Engines in the Prosecution History

The prosecution history also confirms that the asserted claims do not cover single-fuel systems. The parent application of the Bromberg Patents, the '157 Application, was rejected as anticipated by the Gray patent (U.S. Pat. No. 6,651,432). The applicants distinguished their invention as follows: "In all of [Gray's] embodiments, ***only a single fuel is used*** rather than varying mixtures of a primary fuel and a directly injected antiknock agent as disclosed and claimed in the present application." (Ex. 25 (U.S. Appl. No. 11/758,157 File History), at 157 (Jun. 18, 2010 Amendment)). The applicants explained that this differed from "the present invention [which] is a spark ignition engine that utilizes gasoline from a first source that may be either directly or port fuel injected, and direct injection of alcohol from a second source." (*Id.*). The applicants thus distinguished single-fuel systems such as *Gray* (and likewise the Ford engines now accused of infringement), from the dual-fuel invention of the Bromberg Patents. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

This disclaimer was clear and unmistakable, unambiguous, and led the public to believe that engines where "only a single fuel is used" was ***not*** what the applicants

had invented. *See N. Am. Container v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345 (Fed. Cir. 2005) ("To overcome an obviousness rejection, the applicant distinguished his invention from . . . inner walls that are 'slightly concave.' The inescapable consequence of such an argument is that the scope of applicant's claims cannot cover inner walls that are 'slightly concave.'"); *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094–95 (Fed. Cir. 2013) (noting prosecution history's "important role" as "public notice function" on which "competitors are entitled to rely" and because "it provides evidence of how the PTO and the inventor understood the patent."). This was not the only such statement. The applicants also distinguished the prior art *Krauja* reference from their invention (in the original 2004 application, U.S. Pat. Appl. No. 10/991,774) for the very same reason, namely that *Krauja* was "designed to operate on 100% ethanol" rather than "the introduction of any anti-knock agent." (Ex. 7 ('033 Patent File History), 98 (July 10, 2006 Amendment), at 8); *see Wang Labs., Inc. v. AOL, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999) (applying statements from prosecution of a parent application where the subject matter was common to the continuation-in-part application). "Given such definitive statements during prosecution, the interested public was entitled to conclude that" dual-fuel engines were the invention. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013); *see also Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 292 (Fed. Cir. 1995) ("A competitor reviewing

39

the . . . prosecution history would not have to go beyond the public record to reasonably conclude that [Patent Owner] had relinquished claim coverage . . . .").

Even if this Court finds that the specification of the Bromberg Patents encompasses single-fuel embodiments that the 2004 application did not—which would be fatal to EBS's claim of priority to the 2004 application—any such embodiments were nevertheless disclaimed. Ford's construction should thus be adopted.

### d)   EBS Mischaracterizes Statements in the Specification and the Claims

As in *Ford I*, EBS points to a handful of statements that it claims supports its position and entirely ignores the rest. EBS primarily relies upon four categories of statements in the specification: (1) relating to the use of ethanol; (2) operation of the dual-fuel system when one fuel is exhausted; (3) the known physical properties of gasoline; and (4) disparate citations to drawbacks of ethanol or the use of mixtures. Last, EBS points to claims in the newly issued patents that it argues require single-fuel systems. None of EBS's citations support its proposed construction.

First, EBS frequently cites to a single statement in the specification that notes in certain circumstances "it may be useful for 100% of the fuel to come from ethanol." (EBS Opening, 5, 11, 27 (citing Ex. 1 ('026 Application), 4:6-8)). But this statement does not demonstrate that the fuel system used is single-fuel. Instead, this passage simply contemplates that under certain operating conditions the fraction of

40

ethanol used by the engine increases to 100%, while the gasoline (for some short period) would be 0%. Further, EBS forgets that during prosecution the inventors distinguished systems like *Gray* and *Krauja* that used only a single fuel throughout the drive cycle. (*See* § III.A.2.c), *infra*). EBS's interpretation is simply wrong and cannot support broadening the claims beyond a dual-fuel system.

Second, EBS claims that the Bromberg Specification teaches "it may be advantageous to direct and port inject <u>gasoline alone.</u>" (EBS Opening, 5–6 (citing Ex. 1 ('026 Application), 17:5–8) (emphasis original); *see also id.*, 11, 12, 27). The cited portion of the specification does no such thing. Rather, the patent again discusses a specific operating situation of the dual-fuel engine: "when ethanol has been exhausted." (Ex. 3 ('965 Patent), 12:20–58). This passage further describes such a situation as a "low performance" mode (also known as a "limp home mode"). (Ex. 3 ('965 Patent), 12:30–31 (describing such conditions as "***far below what ethanol could achieve***")). Nothing about this disclosure changes the fact that the inventions described are dual-fuel engines. In fact, this passage confirms as much because to "exhaust" the ethanol, ethanol must have been present in the first place.

Third, EBS points to Table 3 to argue that direct injection of gasoline alone is described. (EBS Opening, 12). All that table discloses is the known teaching in the prior art of gasoline as a "starting point," as evidenced by its diminutive antiknock properties and its status at the top of the sorted list. (Ex. 3 ('965 Patent), Table 3; *see*

41

*also* Ex. 9 (*Markman* Transcript), 20:6). In fact, the portion of the specification immediately preceding this table states that "Table 3 shows the properties of proposed fuel antiknock/alternative fuels. Although some of these additives have higher octane numbers than gasoline, some of them have a much larger effect on the cylinder change temperature." (Ex. 3 ('965 Patent), 14:43–47). The passage goes on to continue to compare these other fuels to gasoline. In other words, the reason gasoline is provided in Table 3 is merely for comparative value. This is no different than the 2004 application's citation to *Stokes* et al. (Ex. 26 ('839 Patent), 3:67–4:2).

Fourth, EBS argues that while ethanol is preferred, direct injection of gasoline alone is also described. (EPS Opening, 11). However, the first passage that EBS relies on (Ex. 1 ('026 Application), 17:5–11) discusses what happens when ethanol runs out, as described above, and does not describe a gasoline-only engine. The second passage discusses directly injecting a mixture of ethanol and gasoline, not a gasoline-only engine. For example, immediately before the sentence at Ex. 1, 15:29 that EBS relies on, the specification states: "ethanol consumption can be minimized if the gasoline is ***also directly injected***." (Ex. 1 ('026 Application), 15:28 (corresponding to Ex. 3 ('965 Patent), 11:30–31)). As with the *Ford I* patents, this describes a mixture. (Ex. 9 (*Markman* Transcript), 19:25–20:3 (referring to Ex. 26 ('839 Patent), 3:54–57)). EBS's reliance on the statement that "it is possible to use gasoline-ethanol mixtures, such as E85" is also misplaced. (EBS Opening, 13 (citing

42

Ex. 1 ('026 Application), 20:6–8)). EBS leaves out that Figures 4A and 4B of the patent teach that, in such instances, the ethanol is separated using an "ethanol separator" leading to a separate "ethanol tank" before being directly injected into the engine. (Ex. 3 ('965 Patent), Fig. 4A; *see also id.*, 13:51–55, 14:3–6).

EBS's citations to the specification's "drawbacks to using ethanol, including its 'availability and cost'" also fail. These very "drawbacks" were acknowledged and recited in the specification of the *Ford I* patents, which this Court found "in its entirety" was directed to dual-fuel engines (as now affirmed by the Federal Circuit). (*See* Ex. 26 ('839 Patent), 1:50–53; 6:28–31; *see also* Ex. 9 (*Markman* Transcript), 19:13–16).

Last, EBS argues that Claims 12, 14, 21 and 31 of the '580 Patent and Claims 11, 20, 28, and 33 of the '760 Patent support its construction. (*See* EBS Opening, 6, 28, 30). But these claims only cover an embodiment in which gasoline is both port and direct injected. In other words, yet again, this covers an embodiment of direct injection of a mixture.

e)   <u>Ford's Previous Statements do not Warrant Rejecting Ford's Construction</u>

EBS also mischaracterizes statements made by Ford about U.S. Patent No. 7,225,787 ("the '787 Patent," a parent of the Bromberg Patents) in failed petitions for *Inter-Partes* Review. EBS argues that "Ford told the PTAB that the Bromberg Specification recites <u>gasoline-only</u> embodiments that direct and port inject the same

'gasoline.'" (EBS Opening, 30–31 (emphasis original)). Ford did no such thing. The '166 IPR Petition states that the '787 Patent discloses that gasoline can be directly injected into the engine and that gasoline can be port injection into the engine—but Ford does not characterize this as a "gasoline-only" disclosure or a single-fuel engine. (*See* Ex. 8 ('166 IPR Petition), 21). Ford does not dispute that the Bromberg Patents (and even the *Ford I* patents) discuss direct injection of gasoline (with direct injection of an anti-knock agent); what Ford disputes is that the Bromberg or *Ford I* patents describe a gasoline-only engine as the invention.

EBS also ignores that many of Ford's statements referred to the language of Claim 1 of the '787 Patent, a patent that is not asserted here. Claim 1 of the '787 Patent explicitly recites "a means for direct fuel injection of gasoline" along with "means for direct injection of liquid E 85 from a second source." (Ex. 27 ('787 Patent), Claim 1). This language does not appear in the claims at issue here, and even still contemplates the use of two different fuels and two different sources for those fuels.

Finally, EBS fails to provide any case law supporting its argument that Ford's never-adjudicated invalidity contention arguments, or statements made in petitions for IPR that were not instituted, have any legal bearing on the proper construction of claim terms in different patents. As explained above, the controlling intrinsic record (and EBS's priority claims) make clear that the Bromberg Patents are directed to

dual-fuel engines.

### 3. **Plaintiffs' Reply Position**

Ford's argument boils down to its insistence that the Bromberg Patents are no different from the inventions at issue in *Ford I*. But Ford cannot escape the fact that the Bromberg Patents contain a different specification—one that Ford admitted contains the very "single-fuel" and "same fuel" disclosures that the Court found missing from the *Ford I* specification at issue in the prior case.

To ensure Ford is held to its burden, Plaintiffs continue to address each limitation separately before moving on to Ford's common prosecution history argument. *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1300 (Fed. Cir. 2014) (rejecting construction that "contradicts the specification" and conflicts with "otherwise unambiguous claim language").

Nevertheless, as an initial matter, Ford's general emphasis on the Court's rulings in *Ford I* is misplaced. The Court's focus in the prior case was on the disclosures in the 2004 application. The Court never addressed the Bromberg Specification, which Ford admits was amended specifically "to provide written description support for … single fuel claims." Ex. 8 ('166 IPR Petition) at 10-11 & n.10. Not surprisingly then, the Federal Circuit has held that, in cases like this one where a specification's "unique written description was never considered in that

[prior] case," prior claim construction and written description rulings are not determinative. *Trading Techs.*, 728 F.3d at 1320-21.

a)   Ford's "Different Fuels" Requirement Is Wrong.

(1)   *Ford Identifies Nothing in the Specification to Support Its "Different Fuels" Requirement.*

Tellingly, Ford offers **not one citation** to the claims or the specification to support its argument that the "directly injected fuel" always must be a "fuel ... that is different from the fuel used for port injection/in the second fueling system." This failure should be dispositive. If Ford had **any** intrinsic support for its "different fuels" requirement, it would have cited it.[5] Ford has cited nothing because its position is contradicted by the intrinsic record.

Ford's failure to offer any support for this part of its construction is sufficient to reject it. *Presidio Components, Inc. v. AVX Corp.*, 825 F. App'x 909, 917 (Fed. Cir. 2020) (rejecting construction proposed by appellant who "points to nothing in the specification to suggest that the word 'end' in the context of the patent is used only to refer to lengthwise extremities"). As a result, the Court should decline to adopt Ford's "different fuels" limitation.

(2)   *The Bromberg Patents Disclose Embodiments That Use the Same Fuel for Both Direct and Port Injection.*

---

[5] Ford relies solely on statements made by one judge of the three-judge appellate panel to support its disagreement with the legal standard recited in *Continental Circuits*. Such statements cannot override binding Federal Circuit law.

There is a reason Ford identifies no support for its "different fuels" limitation. None exists. As Ford itself admitted, the Bromberg Specification was amended "to provide written description support for … single fuel claims." Ex. 8 ('166 IPR Petition) at 10-11 & n.10. And while Ford now tries to take back its many admissions, Ford cannot escape the disclosures that prompted it in the first place.

First, as explained, the Bromberg Specification discloses a single-fuel embodiment in which ethanol alone is direct and port injected. Ex. 1 at 4:6-8; Ex. 3 ('965 Patent) at 3:22-26. As the Specification recites: "[T]o obtain the highest possible octane enhancement while still maintaining combustion stability, it may be useful for <u>100% of the fuel to come from ethanol with a fraction being port injected</u>, as an alternative to a small fraction of the port-fueled gasoline." *Id*. This single-fuel embodiment squarely contradicts Ford's claim that "[n]owhere is a single-fuel embodiment depicted." Ford Answ. at 36.

Indeed, the consequences of this disclosure for Ford's position are demonstrated by the lengths Ford goes to avoid it. As shown below in <span style="color:red">**red**</span>, Ford cuts the relevant sentence in half and fails to mention (much less address) the portion that makes crystal clear that gasoline is not used in this embodiment:

| What Ford "says" the specification says: | "**EBS frequently cites to a single statement in the specification that notes in certain circumstances 'it may be useful for <u>100% of the fuel to come from ethanol</u>.'**" Ford Answ. at 40. |
|---|---|
| What the specification | "[T]o obtain the highest possible octane enhancement while still maintaining combustion stability, it may be useful for **100% of the** |

| actually says: | **<u>fuel to come from ethanol</u> with a fraction being port injected, as an alternative to a small fraction of the port-fueled gasoline**." Ex. 1 at 4:6-8; Ex. 3 ('965 Patent) at 3:22-26. |
|---|---|

Ford also is wrong that this disclosure "does not demonstrate that the fuel system used is single-fuel" but contemplates only that "the fraction of ethanol used by the engine increases to 100%, while the gasoline (for some short period) would be 0%." Ford Answ. at 40-41. Just two paragraphs earlier, the Bromberg Specification recites an embodiment that uses "100% or close to 100% use of direct injection of ethanol" with "[a] small amount of port injection of gasoline." Ex. 1 at 3:28-30; Ex. 3 ('965 Patent) at 3:9-12. It then immediately contrasts this ethanol/gasoline embodiment with the 100% ethanol embodiment—explaining that, in the embodiment at issue, "100% of the fuel" comes "from ethanol with a fraction being port injected, <u>as an alternative to a small fraction of the port-fueled gasoline</u>." Ex. 1 at 4:6-8; Ex. 3 at 3:22-26.

In sum, the Bromberg Specification's disclosure of an ethanol-only, same-fuel embodiment directly contradicts Ford's "different fuels" requirement. That is reason enough to reject Ford's construction. *Nobel*, 903 F.3d at 1381 (claims must not be construed "in a way that excludes disclosed embodiments"); *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1353-55 (Fed. Cir. 2003) (holding that claims should be construed to encompass every "operating mode" disclosed in specification). And to be clear, the Bromberg Specification likewise discloses other

48

single-fuel embodiments, including embodiments that use "gasoline direct injection (GDI) while at the same time port-fuel injecting a fraction of the gasoline." Ex. 1 at 17:3-11; Ex. 3 ('965 Patent) at 12:20-34.

Second, <u>Ford has admitted that the Bromberg Specification disclosed a single-fuel system</u>. In particular, in its *Ford I* invalidity contentions, Ford asserted that the Bromberg Specification disclosed a system in which "gasoline is port injected" and "[g]asoline can also be directly injected." such that Bromberg anticipated the *Ford I* patents even if they disclosed single-fuel embodiments. Ex. 10 at 58. And contrary to what Ford now represents, there was no ambiguity about what Ford was arguing. Ford correctly described this embodiment as disclosing that "<u>the directly injected fuel has **the same octane number** as the port-injection fuel</u>," including "gasoline in both cases"—demonstrating that the same fuel (or fuel mixture) can be direct and port injected. Ex. 10 at 61.

And that is just the first of Ford's many admissions. Ford also argued that the Bromberg Specification was amended to provide written description support for "single fuel claims." Ex. 8 ('166 IPR Petition) at 10-11 & n.10. Ford's expert agreed. He testified that the Bromberg Specification anticipates "a system where the same fuel from the same fuel source is both direct injected and port injected." Ex. 32 (Clark Decl.) at 65, 83.

In short, Ford clearly understood (and repeatedly admitted) that the Bromberg Specification discloses the very same-fuel embodiments that Ford's construction would exclude. And contrary to Ford's argument that such admissions are irrelevant, the Federal Circuit has explained that an infringer's statements regarding a patent or claim term is compelling evidence of how "those skilled in the art would construe the claims." *Gillette*, 405 F.3d at 1374.

Finally, the Bromberg Specification's disclosures about the port injected fuel further demonstrate the error in Ford's "different fuels" requirement. It discloses port injecting a range of different fuels, including "port fuel injection of ethanol," Ex. 1 at 7:14-15, as well as "[p]ort fuel injection of gasoline," *id.* 3:30-4:1. It also states that "it is possible to use gasoline-ethanol mixtures, such as E85." *Id.* at 20:6-7. In none of these disclosures does the Bromberg Specification even suggest that the port injected fuel must differ from its directly injected counterpart.

In sum, the Bromberg Specification's repeated disclosures of same-fuel embodiments, combined with the absence of any language disclaiming same-fuel embodiments, proves that Ford's "different fuels" requirement is incorrect—a reality Ford already has repeatedly admitted.

b)   <u>Ford's "Not Gasoline" Requirement is Also Wrong.</u>

    *(1)   The Claims Contradict Ford's "Not Gasoline" Requirement.*

Ford points to nothing in such language that even arguably supports its requirement that directly injected fuel must "contain an anti-knock agent that is not gasoline." Instead, the claims confirm that—in some embodiments—<u>only</u> gasoline is direct injected.

Specifically, as Plaintiffs explain above, eight dependent claims specify that the "first fueling system [direct injection] is configured to introduce <u>gasoline</u> into the engine and the second fueling system [port injection] is configured to introduce <u>gasoline</u> into the engine." Ex. 4 ('580 Patent), Claims 12, 14, 21 & 31; Ex. 5 ('760 Patent), Claims 11, 20, 28, & 33. All of these claims depend from independent claims that recite a "first fueling system that uses direct injection" and "a second fueling system that uses port injection" (or equivalent language). *See* Ex. 4 ('580 Patent), Claims 1, 13 & 23; Ex. 5 ('760 Patent), Claims 1, 13, 21, & 29.

As such, Ford's construction—inserted into dependent Claim 12 of the '580 Patent below in <span style="color:red">red</span>—would preclude exactly what the dependent claims require:

> The fuel management system of claim 1, wherein the first fueling system is configured to introduce **gasoline** <span style="color:red">**[a fuel that contains an anti-knock agent that is not gasoline, and that is different from the fuel used for port injection / in the second fueling system]**</span> into the engine and the second fueling system is configured to introduce **<u>gasoline</u>** into the engine.

51

Unable to explain the obvious conflict between the claims and its proposed construction, Ford instead argues that these claims do not refer to the direct injection of gasoline alone, but to the "direct injection of a <u>mixture</u>" of gasoline and another fuel. Ford offers nothing to substantiate this argument. Nor can it.

Ford's argument contradicts the plain language of claims, which reference only gasoline—nothing else. *See Genentech*, 2019 WL 2493446, at *9 (Connolly, J.) (rejecting construction that "conflicts with the plain language of the claim"). Ford's "mixture" interpretation also is inconsistent with Ford's admissions that a POSITA would understand the Bromberg Specification to disclose embodiments in which only gasoline was directly injected:

- "Figure 1 shows a fraction of **fuel (such as gasoline *or* antiknock agent) being directly injected** and gasoline being port fuel injected ...." Ex. 10 at 68.

- "While the disclosure [Figure 1] is directed to ethanol or an antiknock agent, Bromberg **also discloses using directly injected gasoline** would have a cooling effect such that directly injected gasoline would be employed **even in the absence of ethanol** for knock avoidance." *Id.* at 67.

- "Bromberg discloses that **gasoline can also be directly injected** using the same control approach **when ethanol is not employed** ...." Ex. 32 (Clark Decl.) at 104.

Because Ford's "different fuels" construction is inconsistent with its own prior admissions and would "render several dependent claims meaningless," it is incorrect and must be rejected." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,

520 F.3d 1358, 1362 (Fed. Cir. 2008); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 & n.4 (Fed. Cir. 2020) (reversing construction that was "inconsistent with [the] dependent claims" and would result in their "exclu[sion]").

(2)     *The Specification Contradicts Ford's "Not Gasoline" Requirement.*

Ford's "not gasoline" limitation also is inconsistent with the Bromberg Specification, which repeatedly discloses that "gasoline direct injection (GDI)" can be used without stating that the fuel must contain a separate non-gasoline anti-knock agent. Ex. 1 at 17:7; *see id.* at 17:10-11 ("the directly injected fuel has the same octane number as the port-injection fuel (gasoline in both cases)"); *id.* at 20:18–21:2 (Table 3, describing "[a]ntiknock properties of various fuels" including "gasoline" and explaining that, although "alcohols have optimal properties" for improving knock resistance, "gasoline direct injection" is also possible); *see* Ex. 3 ('965 Patent) at 12:26-27, 12:29-34, 14:54-15:3. In none of these examples does the specification require that, when gasoline is directly injected, it must "contain an anti-knock agent that is not gasoline."

Because Ford cannot erase these disclosures, Ford takes a different tack: asserting that the Bromberg Specification as a whole describes the "invention" as exclusively a "dual-fuel engine." Ford is wrong for at least two reasons.

**First**, Ford and its expert both admitted that the Bromberg Specification teaches the direct injection of gasoline alone. Ex. 32 (Clark Decl.) at 89 ("Bromberg

specifically discloses directly injecting gasoline ...."); *id.* at 104 ("[G]asoline can also be directly injected ... <u>when ethanol is not employed</u> in fueling the engine."); Ex. 10 at 68 (Bromberg "shows a fraction of fuel (such as gasoline <u>or</u> antiknock agent) being directly injected ...."); *id.* at 62 (admitting Table 3 discloses "<u>alternatives to ethanol</u>, including gasoline"); *id.* at 67 ("Bromberg also discloses using directly injected gasoline ... <u>even in the absence of ethanol</u> ....").

Despite these prior admissions, Ford now argues the exact opposite: that the Bromberg Specification does not disclose any embodiments in which gasoline alone is directly injected. Ford is wrong. As explained, the Bromberg Specification expressly discloses several embodiments that directly inject gasoline alone.

For example, the specification recites an embodiment that uses "gasoline direct injection (GDI), while at the same time port-fuel injecting a fraction of the gasoline." Ex. 1 at 17:3-11; Ex. 3 ('965 Patent) at 12:20-34. And contrary to Ford's attempt to label this "as a 'low performance' mode,"[6] the Bromberg Specification discloses that "low performance" mode uses only port injection of gasoline. It then immediately explains that (1) "in some cases a <u>means of operating the vehicle at higher loads would be desired</u>" and (2) this could be accomplished by adding "<u>gasoline direct injection (GDI)</u>," which allows the engine to "operate at higher loads and higher torques." Ex. 1 at 17:3-11; Ex. 3 ('965 Patent) at 12:20-34.

---

[6] Ford—not the inventors—describe this as "limp home mode."

Further, even if this portion of the patent described what Ford dismisses as a "specific operating situation" when ethanol is unavailable, it would make no difference. The Federal Circuit has held that a term should be construed to encompass every "operating mode" disclosed in a specification. *Northrop*, 325 F.3d at 1353-55; *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1363 (Fed. Cir. 2018) (explaining that a disclosure that an invention can operate in a particular mode "nonetheless teaches that aspect of the invention").

For example, in *Northrop*, Defendants argued that the invention must be limited to operating in "a 'command/response' environment" given that the patent "refers repeatedly to the advantages of the invention in that context." 325 F.3d at 1353-55. The Federal Circuit rejected that argument, explaining that although "[i]t is no doubt true that the inventor conceived that the invention ... would be used principally, if not exclusively, in a 'command/response' environment," the specification contained no statement "that the invention can be used <u>only</u> with a 'command/response' protocol." *Id.* The court thus held that "the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context." *Id.*

The Bromberg Specification is even more explicit. As Ford has acknowledged, it discloses not only that a single fuel (gasoline) could be both direct and port injected, but how to implement such an embodiment:

> **A person of ordinary skill in the art** would understand that Bromberg discloses using the same control approach when gasoline is directly injected as when ethanol is directly injected. **Bromberg discloses that gasoline has a cooling effect, and therefore the same control approach would be used**.

Ex. 10 (Invalidity Contentions) at 132.

Ford's expert agreed. He testified that the Bromberg Specification "discloses that gasoline can also be directly injected using the same control approach <u>when ethanol is not employed in fueling the engine</u>." Ex. 32 at 100-101.

Ford's characterization of Table 3 likewise is inconsistent with its prior statements. For example, Ford now asserts that "[a]ll that table discloses is the known teaching in the prior art of gasoline as a 'starting point.'" Ford Answ. at 41. Ford previously argued the opposite: that a POSITA would understand this disclosure as "speak[ing] to <u>alternatives to ethanol, including gasoline shown in Table 3</u>." Ex. 10 at 62. Moreover, Ford explained that the reason gasoline could be considered an "alternative[] to ethanol" was because "Bromberg specifically discloses directly injecting gasoline for a cooling effect." *Id.* at 61.

**Second**, Ford also is wrong that the specification "describ[es] 'this invention' or 'the present invention' as directly injecting ethanol or another second fuel that is not gasoline." Ford Answ. at 35. Ford does not quote the entirety of the portions of the specification that it cites, which show that the specification is referring to specific embodiments or use cases—not the invention as a whole:

56

| Ex. 3 ('965 Patent) at 1:64-67 | "A preferred anti-knock agent is ethanol. <u>In a preferred embodiment of this aspect of the invention</u>, part of the fuel is port injected and the port injected fuel is gasoline." |
|---|---|
| *Id.* at 13:20-22 | "The <u>other antiknock agents</u> contemplated for use in this invention also have a small number of carbons relative to gasoline." |
| *Id.* at 16:27-30 | "Particularly <u>during the introduction phase of the present invention</u>, the ethanol fueling could be performed by the use of containers, such as one-gallon containers." |

None of these isolated parts of the specification are limiting or otherwise "demonstrate[] a clear intention to limit the claim scope" by requiring that the directly injected fuel contain an anti-knock agent that is not gasoline. *Cont'l Circuits*, 915 F.3d at 797. More importantly, the specification's disclosures of direct injection of gasoline alone show that the portions Ford identifies are contradicted by "other portions of the intrinsic evidence [that] do not support applying the [proposed] limitation to the entire patent." *Id.* at 798 (citation and quotation marks omitted).

In sum, the Bromberg Specification nowhere requires that the fuel "contain an anti-knock agent that is not gasoline" and instead teaches that gasoline alone may be directly injected. Ford's "not gasoline" limitation thus should be rejected.

c)      <u>Ford's Prosecution History Argument Fails.</u>

Ford's prosecution history arguments are based on two references: (1) the abandoned '157 Application and (2) the unasserted '774 Application. Neither is

sufficient to meet the "high standard for finding a [prosecution] disclaimer." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1046 (Fed. Cir. 2016).

In particular, the Federal Circuit has explained that the prosecution history of other related patents is relevant only in limited circumstances, including if "it addresses a limitation in common with the patent in suit." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001). As such, where there are "no common claim terms in dispute," disclaimer does not apply. *Id*. at 1305-06. Further, even in cases where common terms exist, disclaimer applies only in cases where the relevant amendment or lexicographic limitation "'clearly and unmistakably' addresses" that common language. *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1058 (Fed. Cir. 2009) (rejecting disclaimer argument where claim amendments "more directly address claim language not disputed in this case").

These principles demonstrate that none of the statements Ford points to have any bearing on the claims or claim terms now at issue. First, neither the '157 Application nor the '774 Application uses the claim terms at issue: "directly injected fuel" (and variants thereof). As such, there is no credible argument that the applicants somehow disclaimed the plain and ordinary meaning of such terms.

Second, unlike the Bromberg Patents, the claims of the '157 Application and the '774 Application expressly required the direction injection of either "alcohol" (the '157) or an "anti-knock agent" (the '774). Not surprisingly then, the applicants

58

emphasized these <u>express claim requirements</u> when distinguishing the Gray and Krauja references. Nevertheless, to avoid opportunistic arguments like Ford now makes, the applicants emphasized that their prosecution arguments did not describe their invention as a whole. For example, when addressing the '157 Application, the applicants stated:

> **<u>As set out in the claims</u>**, the present invention is a spark ignition engine that utilizes **gasoline** from a first source that may be either directly or port fuel injected, and direct injection of **alcohol** from a second source.

Ex. 25 at 157. Tellingly, Ford omits the underlined text from its quotation.

Finally, also telling is Ford's admission that it understood that the inventors amended the *Ford I* specification "to provide written description support for these single fuel claims" in the Bromberg Specification. Ex. 8 ('166 IPR Petition) at 10-11 & n.10. As the Federal Circuit also has explained, it is particularly improper to import a limitation into the child patent claims based on the prosecution history of the parent application where "[t]he patentee's whole point in filing the [child application] was to secure broader claims" by removing a claim term. *Advanced Cardiovascular*, 265 F.3d at 1305-06.

**4.**     **Defendant's Sur-Reply Position**

a)     The Specification and Claim Language Support Ford's Construction

(1)     *"Different Fuels"*

EBS argues that "Ford offers not one citation" to support its "different fuels" requirement. (EBS Reply, 46). EBS is wrong. The entire specification, including the Figures, support the "different fuels" construction. (*See* Ford Answering, 34–37 (citing Ex. 3, 1:20–24, 24–36, 37–39, 61–63, 64–67; 2:2–5; 8:4–8; 5:6–10; 13:20–22; 16:7–30; Title; Figs. 1–5)). Each of Figures 3–5 shows two different fuels—ethanol and gasoline. (Ex. 3, Figs. 3–5). The specification consistently describes directly injecting an anti-knock agent as "the invention," "the present invention," and as the advantage and distinction of the invention. (Ford Answering, 35, 38. Such statements support Ford's argument that the claims require different fuels. *On Demand*, 442 F.3d at 1340.

EBS's citations support this understanding. (EBS Reply, 20 (citing Ex. 1, 4:6–8, 17:3–11, 20:6–8)). EBS first cites the statement "it may be useful for 100% of the fuel to come from ethanol with a fraction being port injected, as an alternative to a small fraction of the port-fueled gasoline." But the preceding paragraph explains this relates to the "fraction of ethanol ***used during a drive cycle***." (Ex. 3, 3:17–21 (emphasis added)). This quote simply explains how the dual-fuel engine may behave during certain portions of the drive cycle. (EBS Opening, 5, 11; EBS Reply, 19–20,

60

47–48). This disclosure does not teach a single-fuel engine, but rather a dual-fuel engine that can adjust the relative amounts of two fuels. (Ex. 3, 3:9–16 (describing injection of ethanol with a ***second set of injectors*** or a "more complicated system which uses one set of injectors ***for both fuels***.") (emphasis added)). Either way, the engine is specially designed to use two fuels. *See Profectus Tech.*, 823 F.3d at 1381 ("When read in view of the specification, the claims do not permit the expansive construction proposed by [EBS].").

EBS cites Ford's invalidity contentions from the first case to argue that Ford "admitted" that single-fuel engines were disclosed. (EBS Reply, 49–51). But as Ford explained in its Answering Brief, its statements addressed Claim 1 of the unasserted '787 Patent and, crucially, never characterize this as "single-fuel" or "gasoline only." (Ford Answering, 44; *see also* Ex. 10, 58). EBS also points to the discussion in Ford's invalidity contentions of the "lower performance" mode that can be employed when ethanol is exhausted. (EBS Reply, 49 (citing Ex. 10, 61)). For an engine to have a mode that can be employed when ethanol has been exhausted, the engine must have been designed to use ethanol as its second fuel.

EBS's characterizations of Dr. Clark's statements are wrong. (EBS Reply, 17, 20, 49). Dr. Clark never said that the Bromberg Specification discloses as its invention "a system where the same fuel from the same fuel source is both direct injected and port injected." (EBS Reply, 17). The statements EBS cites to relate to

*EBS's construction from Ford I*, not the Bromberg disclosures. (Ex. 32 (Clark Decl.), ¶148). Nearly all the remaining citations from Dr. Clark's declaration that EBS identifies are directed to the same exhausted-ethanol "lower performance mode" discussed above (Ex. 32 (Clark Decl.), ¶¶180, 201, 207).

Five times, EBS states: "As Ford itself admitted, the Bromberg specification was amended 'to provide written description support for . . . single fuel claims,'" or similar. (EBS Reply, 17, 20, 31–32, 45, 47, 49, 59 (citing Ex. 8, 10–11 & n.10)). Ford never argued this. As Exhibit 8 makes clear, Ford wrote that "the common specification . . . was never amended to provide written description support for these single fuel claims," referring to the claims at issue in *Ford I*. In a footnote, Ford then once again points to the same "lower performance mode" discussed above. (*See also infra*, § III.A.4.a).(2)).

*Gillette* is not, as EBS argues, "directly on point." (EBS Reply, 18). The defendant in *Gillette* took contradictory positions on the construction of the term "comprising." 405 F.3d at 1374. Ford never construed the claims of the Bromberg Patents in the IPRs or its *Ford I* invalidity contentions, and *Gillette* is therefore distinguishable. (*See* Ford Answering, 43–45).

EBS next argues that the specification's comparison of port injection of ethanol to direct injection of ethanol supports a single-fuel engine. (EBS Reply, 50 (citing Ex. 1, 7:14–15)). All this passage demonstrates is the benefit of direct

injection of ethanol *over* port injection. (Ex. 3, 5:33–46). Finally, EBS points to a discussion of the type of ethanol used in the engines, and that E85 can be used instead of ethanol. EBS ignores that the preceding paragraph discusses the tank's "separation between the gasoline and ethanol (or other anti-knock agent)." (Ex. 3, 14:16–17). EBS also ignores the preceding statements that the "capability to adjust the volume of the ethanol tank" "would make it possible to operate on different gasoline/ethanol ratios over a drive cycle." (Ex. 3, 13:66–14:5). These statements confirm the invention is a dual-fuel engine. (*See* Ford Answering, 36 (citing Ex. 3, Figs. 4A, 4B)).

### (2)    *"Not Gasoline"*

EBS argues that dependent claims discussing direct injection of gasoline support a single-fuel, gasoline only engine. As previously discussed, these claims merely demonstrate that a mixture of gasoline and ethanol can be directly injected, which Ford does not dispute. (Ford Answering, 42–43).

EBS's insertion of Ford's construction into Dependent Claim 12 of the '580 Patent is nonsensical. (EBS Reply, 51–52). That claim does not contain the disputed "directly injected fuel" term. (D.I. 41, 5). Ford's proposed construction would be inserted into the base claim, Claim 1. Ford's construction of this claim, notably, does not preclude the use of other fuels in addition to the anti-knock agent and does not require additional fuels. It simply requires the use of an anti-knock agent, in keeping

with the very purpose of the invention. *One-E-Way, Inc. v. ITC*, 859 F.3d 1059, 1064 (Fed. Cir. 2017) (limiting claim scope where the "summary of the invention touts the claimed invention" for its improvement over prior art, and where the purpose of the patented invention supports such an understanding).

EBS then incorrectly argues that claimed injection of a mixture is at odds with previous statements by Ford—yet all three quotes provided by EBS describe the same "lower performance" mode that occurs when ethanol is exhausted. (EBS Reply, 52–53 (citing Ex. 10, 68, 67; Ex. 32, 104)). This exhausted-ethanol operating mode has no bearing on whether the anti-knock agent is "not gasoline." Ford's statements are not at odds with its construction.

Turning to the specification, EBS cites to only two disclosures (albeit repeatedly, over six pages). Neither supports rejecting Ford's construction. The first relates to the exhausted-ethanol embodiment. (Ex. 3, 12:20–34). As discussed above (Ford Answering, 41–42), this passage supports a dual-fuel engine. Further, Ford's construction does not exclude this ethanol-exhausted embodiment as EBS argues. For example, EBS could have added a dependent claim that recited "the fuel management system of claim 1 wherein when the fuel from the first fueling system is exhausted, fuel from the second fueling system is introduced through the first fueling system." Further, nothing in this passage says that the anti-knock agent can be gasoline.

64

With regard to Table 3, EBS does not argue that Ford's characterization of Table 3 is incorrect. Instead, EBS again misuses Ford's IPR statements. EBS's failure to address the substance of Ford's Table 3 arguments is telling. As discussed in Ford's responsive brief, this table clearly supports a dual-fuel engine. (Ford Answering, 41–43).

EBS again relies on improperly characterized statements from Ford's IPRs. In none of these statements does Ford say the anti-knock agent can include gasoline. Nor does Ford state that the disclosed engines are configured as single-fuel engines, because they are not.

EBS relies on *ParkerVision.* (EBS Reply, 55). Unlike *ParkerVision,* which addresses a method claim, these patents recite apparatus claims, not method claims. *Parkervision* thus has no import here.

*Northrop* is similarly inapplicable. 325 F.3d at 1355.[7] For one, EBS misstates its holding: "operating mode" is a term from the patent asserted in that case, not, as EBS suggests, a synonym for "embodiment." Nowhere does *Northrop* articulate reasoning that "claims should be construed to encompass every operating mode disclosed in the specification." (EBS Reply, 48, 55). In decisions citing to *Northrop*, the Federal Circuit explained: "[t]he fact that a patent asserts that an invention

---

[7] Two of the three pages cited by EBS in *Northrop* address means-plus-function claims not at issue here. *Id.* at 1353-54.

achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004). Further, unlike *Northrop*, here the specification uniformly discusses that the invention is dual-fuel, and single-fuel engines were disclaimed during prosecution.  (*See* § III.A.2.d) *infra*).

EBS's attempts to explain away the patent's use of "the present invention" to disclose the use of an anti-knock agent likewise fail. (EBS Reply, 56–57). The first quote (Ex. 3, 1:64–67) may indeed refer to "a preferred anti-knock agent" and "a preferred embodiment of this aspect of the invention," but nowhere does the patent describe a contradictory aspect or embodiment where the engine always uses the same fuel from the same source. Meanwhile, direct injection of an anti-knock agent is pervasive and consistent.

In sum, the very purpose of the patent is direct injection of fuel containing an anti-knock agent that is not gasoline. The specification describes an "optimized fuel management system" where "an anti-knock agent which is a fuel is directly injected into a cylinder of the engine." (Ex. 3, 1:20–23). Every embodiment of the patent discloses direct injection of this anti-knock agent (even the exhausted-ethanol "lower performance" mode, which, as described above, requires the anti-knock agent in the first instance).

66

b)    EBS's "Plain and Ordinary Meaning" Construction
      would Divorce the Claims from the Specification

EBS provides no intrinsic record support for its expansive reading of the claims. EBS asks the Court to construe its claims to include the use of ***any fuel*** running through ***either fueling system***. (EBS Opening, 28–29). Under EBS's untethered construction, gasoline could be directly injected while kerosene is port injected, or the engine could run entirely on kerosene. Further, EBS's construction, which seeks to read the claims as a single-fuel engine, reads out the preferred embodiments. An engine incapable of using a second fuel with an anti-knock agent ignores the entire specification, but for a handful of sentences directed to portions of the engine cycle rather than the engine configuration. (*See* Ford Sur-Reply, § III.A.4.a), *supra*).

c)    EBS Disclaimed Single-Fuel Engines

EBS's prosecution history arguments fail. For one, prosecution history disclaimer from a parent application applies when ***subject matter*** is common, not simply in the case of identical claim terms. *Wang Labs.*, 197 F.3d at 1384; *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003). The Federal Circuit has explained that *Advanced Cardiovascular*, relied upon heavily by EBS, does not require identical claim terms. *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1070 (Fed. Cir. 2019) ("We do not read *Advanced Cardiovascular* to [require] that to consider a parent patent as intrinsic evidence, the

67

exact claim term at issue in the child patent must appear in the parent patent's claims.").

The *Gray* disclaimer, made during prosecution of the parent patent of all Asserted Patents, addressed directly injected fuels introduced for knock suppression, the same subject matter as the Asserted Claims. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) ("[T]he specifications of the . . . parent of three of the patents in issue, and all the presently litigated patents, have the same content . . . Thus, the prosecution history of the claims of application [] which led to the [parent], are relevant in construing the claims [of the patents in issue].").

Applicants told the public that their invention was ***not*** like *Gray* because their invention used two separate fuels; consequently, their claims should be so limited. *Id*. at 1316 ("[The specifications] in all respects tell us what the claims mean, buttressed by statements made during prosecution in order to overcome a rejection."). "[T]o attribute to the claims a meaning broader than any indicated in the patents and their prosecution history would be to ignore the totality of the facts of the case and exalt slogans over real meaning." *Id*. at 1316. This disclaimer controls.

**B. "increases knock suppression by evaporative cooling"** ['965: Claims 1, 14, 17, 19]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| Plain and ordinary meaning. | This term should not be afforded any patentable weight. |

### 1. Plaintiffs' Opening Position

The parties agree on the meaning of this term. The only dispute is whether "increas[ing] knock suppression by evaporative cooling" should be afforded patentable weight. It should.

Plaintiffs are at a loss to understand Ford's argument that this term should not have patentable weight. "Each element contained in a patent claim is deemed material to defining the scope of the patented invention." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) (citation omitted).

Accordingly, to ensure they were addressing Ford's arguments, Plaintiffs asked Ford during the parties' meet and confer to explain the "grounds on which you are basing your 'no patentable weight' argument ... (e.g., intended result, non-functional descriptive material, admitted inherency etc.)." Ex. 14 (Email with Ford) at 3. Ford refused to provide that information—stating:

> [W]e believe that [this] term should not be afforded any patentable weight and have identified it as such in the chart. To the extent Plaintiffs disagree, you are free to articulate your basis for that disagreement in the claim construction briefing. And, in any event, **Plaintiffs have an opportunity to reply to any arguments Ford makes in its briefing**.

*Id.* at 1.

Ford's position frustrates this Court's meet and confer obligation and turns the claim-construction process on its head—forcing Plaintiffs to guess Ford's position just to try to address it. For at least this reason, Ford's argument should be rejected.

### 2.   Defendant's Answering Position

This term should not be afforded patentable weight. First, this term describes an inherent property of fuel that is directly injected and therefore is of no patentable consequence. Alternatively, the term is functional and at best describes an intended use. Under this reading as well, it is non-limiting.

Inherent limitations add no patentable weight. *See, e.g.*, *Persion Pharms. LLC v. Alvogen Malta Operations LTD.*, 945 F.3d 1184, 1191 (Fed. Cir. 2019) (affirming conclusion that inherent limitations "added no patentable weight" to the asserted patent claims); *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1352 (Fed. Cir. 2017) (explaining that inherent properties "could not confer patentable weight to the claimed mixture"). As admitted by EBS's own expert, a liquid fuel's evaporative cooling property is inherent and has long been known to be a reason for increasing knock suppression. (Ex. 28 (Hannemann Dep. Tr.), 40:14–18, 42:3–25). As a result, this clause cannot be limiting.

Alternatively, this phrase can be read as adding a functional element that describes an intended use: to increase knock suppression. The claims are apparatus claims. "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (emphasis original). "Where the language does not structurally differentiate the claimed apparatus, such as language that states an intended use of the invention, the language is not limiting." *Tabletop Media, LLC v. AMI Entm't Network, LLC*, 2018 WL 2949467, at *6 (D. Del. June 13, 2018) (citations omitted).

The full claim term in which this statement of intended use appears reads: "a first fueling system that directly injects fuel . . . as a liquid and increases knock suppression by evaporative cooling." The disputed portion of this claim does not structurally differentiate the claimed apparatus, but rather, merely describes its use or purpose. *See id.*, at *15 ("A patent applicant is free to recite features of an apparatus either structurally or functionally, [but] the patentability of an apparatus depends on the claimed structure, not the use or purpose of that structure."). Further still, as discussed above, the direct injection of fuel as a liquid was well-known. The claims' intended use for such direct injection is therefore not entitled to patentable weight. *See In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997) ("It is well settled that the recitation of a new intended use for an old product does not make a claim to that old product patentable.").

EBS's citation to *Limelight Networks* is inapplicable. (EBS Op. Br., 18 (citing *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014)). That case does not address whether claim limitations reciting inherent properties or intended uses carry patentable weight.

### 3.   **Plaintiffs' Reply Position**

Both of Ford's no-patentable-weight arguments are wrong.

Ford's inherency argument fails because evaporative cooling is not an "inherent property of fuel that is directly injected." Ford Answ. at 70; *see Person*, 945 F.3d at 1191 (explaining that inherency "is a 'high standard'" that "'may not be established by probabilities or possibilities'" (citation omitted)). The Bromberg Specification describes configurations in which evaporative cooling may not occur, such as when in-cylinder temperature is too cool or wall wetting occurs. *See* Ex. 1 at 9:17-19 (stating that direct injection should occur when "the charge is sufficiently warm for ... vaporization"); *id.* at 14:19-21 (describing injection timing to improve vaporization and reduce "wall wetting"); *see* Ex. 3 ('965 Patent) at 6:63-66, 10:33-37.

Ford's "intended use" argument also fails. The fueling systems require <u>structural</u> configurations to ensure evaporative cooling. This includes configuring the timing of the direct injection to ensure "that the charge is sufficiently warm for ...

vaporization" and ensuring fuel is injected "at velocities which minimize any cylinder wall wetting." Ex. 1 at 9:17-24; Ex. 3 at 6:63-7:9.

### 4. Defendant's Sur-Reply Position

Ford stands on its arguments in its Answering Brief.

### C. [where open loop control is] "used during transients in engine load" ['965: Claims 1, 14, 19] / [wherein the fuel management system is configured to use open loop control during] "transients in torque" ['760: Claim 25]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| Plain and ordinary meaning.<br><br>**Alternatively:** "used during sudden changes in engine load" / "used during sudden changes in torque" | "used during changes in engine load" / "used during changes in torque" |

### 1. Plaintiffs' Opening Position

The dispute regarding this term is whether the word "transients" should be construed to mean "changes." It should not.

Ford's own patents demonstrate that "transients" is a term of art that is shorthand for "transient engine operation," which refers to "sudden" changes in engine load or torque "demand (e.g., due to an operator pedal tip-in)." Ex. 15 (Ford U.S. Patent No. 9,708,972) at 9:53-67; *see, e.g.*, Ex. 16 (Ford U.S. Patent No. 6,820,599) at 11:64-65 (exhaust gas recirculation "can be used during transients"); Ex. 17 (Declaration of Dr. Gregory Shaver) ¶ 7. Transient operation contrasts with what is known as "steady-state" operations. Ex. 18 (Ford U.S. Patent No. 9,476,375)

at 3:62-65 (reciting methods for <u>transient</u> operating conditions, as opposed to "steady-state" conditions). Ex. 11 (*ICEF*) at 611 (contrasting "steady-state engine calibrations" with different calibrations needed for "transient engine operation").

As these sources demonstrate, Ford's construction is inaccurate. "Transient operation" would not be understood by a POSITA to refer to <u>any</u> "change" in load or torque." The term refers to a subcategory of such changes, i.e., certain "sudden" changes during which some engine control techniques (like closed loop control) are not effective or capable of providing the desired control. Ex. 17 ¶ 7. It is for this reason that the Bromberg Specification explains that—in some embodiments— "[d]uring *transients*, open-loop algorithms from a stored engine map (not shown) are used to determine air, gasoline and ethanol flows." Ex. 1 at 12:18-20; *see id.* at 13:1-2; Ex. 3 ('965 Patent) at 9:6-9, 9:27-29.

Because Ford's construction is inconsistent with the plain and ordinary meaning of "transients," the Court should reject Ford's construction.

### 2. Defendant's Answering Position

During prosecution of the '965 Patent, the applicants acted as their own lexicographer in defining "transients" as "changes." *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (explaining patentee acts as its own lexicographer when definition of disputed term is clearly set forth in either

specification or prosecution history). Ford's proposed construction simply holds applicants to their word.

Facing a rejection under 35 U.S.C. § 112 for this precise limitation, "used during transients," the applicants expressly defined the term as "changes." (Ex. 29 (U.S. Appl. No. 14/807,125 File History), at 132 (Feb. 8, 2017 Amendment)). Indeed, the Examiner made many of the same arguments EBS makes in its opening brief, namely that "the term has multiple meanings such as a period of time, zero load or signal, and/or a function of the open loop [control system]." (Ex. 29 ('125 Appl. File History), at 103–104 (Dec. 8, 2016 Office Action)). The applicants acknowledged as much before stating "[i]t is submitted that those of ordinary skill in the art will ***fully understand*** that by transients the inventors are ***merely referring to changes*** in engine load." (*Id*. (emphasis added)). Applicants then amended the claims to add "in engine load" after the term transients. (*Id*.). The '965 Patent was allowed as a direct result of these remarks and amendments. (Ex. 29 ('125 Appl. File History), at 142 (Apr. 20, 2017 Notice of Allowance)). The applicants thus defined "transients" as "changes." *See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) (explaining that deviating from a definition provided during prosecution for the meaning of a claim term would frustrate the public notice function of the prosecution history); *see also CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed. Cir. 1997) ([T]hrough statements made during

75

prosecution or reexamination an applicant for a patent or a patent owner, as the case may be, may commit to a particular meaning for a patent term, which meaning is then binding in litigation."). Ford's construction should be adopted.

EBS ignores this intrinsic evidence and instead focuses solely on disfavored extrinsic evidence. (EBS Opening, 73); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms"). Such extrinsic evidence is irrelevant to claim construction, especially where the patentee provides a definition in the intrinsic record. *See, e.g.*, *Colgate-Palmolive Co. v. Ranir L.L.C.*, 2007 WL 2225888, at *1 (D. Del. July 31, 2007) ("If the meaning of a claim is unambiguous from the intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim construction.").

### 3.    Plaintiffs' Reply Position

Ford does not dispute that the plain and ordinary meaning of "transients" is narrower than "changes." Ford argues only that the applicants purportedly disclaimed the narrower meaning during prosecution. Not so.

As Ford's argument demonstrates, the reason for the amendment was to make clear <u>which</u> transients the '965 Claims were referring to: specifically, "transients <u>in engine load</u>." The scope of the word transients itself was not at issue. Ex. 29 at 132 (noting that the Examiner had rejected the claim for failing to comply with the

enablement requirement because "the term has multiple meanings such as a period of time, zero load or signal, and/or a function of the open loop control system").

As such, there was no disclaimer, and no basis to depart from the plain and ordinary meaning of "transients" Ford's own patents demonstrate.

### 4.      Defendant's Sur-Reply Position

Ford stands on its arguments in its Answering Brief.

### D.      "fuel from the first fueling system is introduced when the engine torque is above a <u>selected value</u>" ['965: Claim 4] / "<u>selected value</u> of torque at which the first fueling system is also employed" ['965: Claim 12]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| Plain and ordinary meaning. | "any value of torque where, above that value, both fueling systems are used"<br><br>"any value of torque where, at that value, both fueling systems are used" |

### 1.      Plaintiffs' Opening Position

Ford asks the Court to re-write the phrase "selected value of torque" or "torque above a selected value" by (1) changing the word "selected" to "any" and (2) inserting a "both fueling systems" limitation. No support exists for either re-write. *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

First, "selected" is a simple word that requires no construction. *See Chef Am., Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) ("[O]rdinary, simple

English words whose meaning is clear and unquestionable ... mean exactly what they say."); *Nokia Sols. & Networks US LLC v. Huawei Techs. Co.*, 2017 WL 2226413, at *26 (E.D. Tex. May 19, 2017) (construing term "[select/selecting] a communication resource " to have its plain and ordinary meaning). Indeed, in *Ford I*, Ford agreed that the term "above a <u>selected</u> torque value" meant just that:



*E.g.*, Ex. 19 (Ford Markman Presentation) at 73.

Second, Ford's "both fueling systems are used" limitation also should be rejected. Claim 4 require only that "fuel from the <u>first fueling system</u>" be injected above a "selected" torque value, and Claim 12 already includes the word "also."

The Court should reject Ford's attempt to re-write this claim term.

### 2.     Defendant's Answering Position

Absent adoption of Ford's construction, the term "selected value of torque" is ambiguous and indefinite. Ford's proposed construction addresses a fundamental flaw in these claims—that nowhere in the Asserted Patents are specific "ranges" or "selected values" taught, despite such terms appearing throughout the claims. The only other appearance of the words "select" or "selected" in the specification reads:

"[t]he injection of the antiknock agent can be . . . initiated when the engine torque is above a selected value or fraction of the maximum torque where the value or fraction of the maximum torque is a function of the engine speed." (Ex. 3 ('965 Patent), 1:54–59). What is the claimed "selected value"? The patent specification does not say.

EBS's opening brief advocating for "plain and ordinary meaning" offers no support in answering this question. (*See* EBS Opening, 77–78). "Selected" may be a "simple word," but this ignores the broader phrase in which it appears, which is not "simple." EBS's cited case about the term "select/selecting" (a verb) also has no bearing on the claimed "selected value." Here, selected is an adjective, not a verb. *Cf. Nokia Sols. & Networks US LLC v. Huawei Techs. Co.*, 2017 WL 2226413, at *26 (E.D. Tex. May 19, 2017).

This flaw of the claims is compounded further by the patents' admission that the "value . . . of the maximum torque is ***a function of the engine speed.***" **(**Ex. 3 ('965 Patent), 1:54–59 (emphasis added); *see also id.*, 7:57–58 ("The occurrence of knock at a given value of torque depends upon engine speed.")). But engine speed appears nowhere in the claims, rendering the claimed "selected value of torque" even more ambiguous. EBS's "plain and ordinary" meaning should be rejected. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) ("A claim term also will not have its ordinary meaning if the term 'chosen by the patentee so

deprives the claim of clarity' as to require resort to the other intrinsic evidence for a definite meaning.").

As to the fundamental question of what the claimed "selected value of torque" is, the specification as a whole provides an answer. Rather than disclose predetermined or selected torque values (or their necessary engine speeds), the patent simply uses torque values and ranges as a "shorthand" to indicate which fueling system(s) are used. *See, e.g.*, 3:3–8, 17–21, 7:57–8:3. EBS admitted as much in the first case, arguing "[t]he terms first torque range and second torque range are used throughout the patents as a shorthand reference for which fueling system is being used. When direct injection is being used, the engine is in the first torque range; when direct injection is not being used, the engine is in the second torque range." (Ex. 30 (*Ford I* Joint Claim Construction Brief (D.I. 109)), at 5).

The Examiner of the '100 Application, which depends from the '965 Patent and is the parent of the '580 and '760 Patents, identified the same flaw in the claims before him: namely, that "[h]aving a first and second torque range is considered arbitrary by the Examiner since no specific range of value or amount is defined . . . the Examiner will understand that the ranges apply ***to any amount*** within a normal working load and condition of a vehicle." (Ex. 31 (U.S. Appl. No. 15/463,100 File History), at 187–88 (Nov. 13, 2017) (emphasis added)). The applicants did not refute

this determination and instead simply abandoned the application. The intrinsic record thus supports Ford's definition.

EBS argues that because Ford did not proffer this term for construction in the first case, it is somehow improper to do so now. (EBS Opening, 78). That is simply wrong. *Amgen Inc. v. Mylan, Inc.,* No. 2:17-cv-01235, 2018 WL 6061213, at *6-7 (W.D. Pa. Nov. 20, 2018) (rejecting argument that petitioner waived claim construction arguments based on its decision to not propose constructions for certain terms in an earlier filed action involving a related patent). Further, as noted above, the prosecution history of the Bromberg Patents includes the rejection of the '100 Application.

EBS's arguments regarding the language of Claims 4 and 12 fail. Claims 4 and 12 depend (ultimately) from Claim 1. Claim 1 requires both a first fueling system and a second fueling system. Far from saying that only the first fueling system is used, Claims 4 and 12 simply narrow *when* the first fueling system is used.

### 3.   **Plaintiffs' Reply Position**

Ford does its best to overcomplicate a simple limitation. The claims require only that (a) a value of torque be "selected" or "determined" as part of the system's configuration; and (b) that direct injection of fuel be "introduced" when that "selected" value is reached. The specification demonstrates this understanding—describing how direct injection may "be initiated when the engine torque is above a

selected value." Ex. 1 at 2:1-3; Ex. 3 ('965 Patent) at 1:55-59. In contrast, Ford's construction would strip from the term its need for a deliberate selection and improperly read a "both fueling systems" limitation into Claim 4, which states only that "fuel from the first fueling system is introduced when the engine torque is above a selected value."

### 4. Defendant's Sur-Reply Position

Ford stands on its arguments in its Answering Brief.

### E. "end gas" ['760: Claim 18, 20]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| Plain and ordinary meaning.<br><br>**Alternatively**: "un-combusted air/fuel mixture remaining after a flame-front reaction" | "un-combusted air/fuel mixture remaining after 75% (by mass) of the fuel has combusted" |

### 1. Plaintiffs' Opening Position

"End gas" is a common term in the field of internal combustion engines. It is defined in the seminal THE INTERNAL-COMBUSTION ENGINE textbook as "that part of the charge which has not yet been consumed in the normal flame-front reaction." Ex. 22 at 112. Ford has used a similar definition in its own patents—explaining that "end gas" is the "unburned mixture when auto ignition occurs." Ex. 12 (Ford U.S. Patent No. 7,370,634) at 1:63-64.

Rather than acknowledge this term's plain meaning, Ford plucks an excerpt from the specification and uses it out of context to suggest that the inventors re-

defined "end gas" to include a specific percentage-based threshold. But the specification demonstrates that this passage simply identifies a <u>sample value</u> that the inventors used in their "CHEMKIN" modeling analysis:

> The compression on the fuel/air mixture end-gas was <u>modeled</u> using the artifact of an engine compression ratio of 21 to represent the conditions of the end gas in an engine with an actual compression ratio of 10. <u>The end gas is defined as the un-combusted air/fuel mixture remaining after 75% (by mass) of the fuel has combusted.</u>

Ex. 1 at 4:9-5:6; Ex. 3 ('965 Patent) at 3:59-4:5.

Because the inventors did not act as their own lexicographers, Ford's attempt to redefine the term should be rejected. If the Court nevertheless requires a construction, Plaintiffs propose that "end gas" be construed to mean "un-combusted air/fuel mixture remaining after a flame-front reaction"—a construction that marries the unobjectionable portions of Ford's construction with the plain and ordinary meaning of "end gas" stated in THE INTERNAL-COMBUSTION ENGINE textbook.

### 2.    Defendant's Answering Position

EBS's argument for its proposed construction of "end gas" amounts to an assertion that a definition from a decades-old secondary reference should somehow take precedence over an ***explicit*** definition in the specification—in which "the end gas is defined as the uncombusted air/fuel mixture remaining after 75% (by mass) of the fuel has combusted." EBS's argument is without merit. *See TriStrata, Inc. v. Microsoft Corp.*, 594 F. App'x 653, 655 (Fed. Cir. 2014) ("Examining the written

description before relying on extrinsic evidence, such as dictionaries, mitigates the risk of 'transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("Indeed, our en banc *Phillips* opinion rejected this very approach . . . 'in which the specification should be consulted only after a determination is made, . . . , as to the ordinary meaning or meanings of the claim term in dispute.'").

Like the term "hot gas," "end gas" is a term of degree that lacks a precise boundary in the language of the claims themselves. Adopting EBS's proposed construction would leave the jury unaided in determining which portion of the air/fuel mixture comprises the "end gas" region. This is improper because "end gas" is explicitly defined in the specification as "the uncombusted air/fuel mixture remaining after 75% (by mass) of the fuel has combusted." This express definition from the specification should be adopted as the construction for this term. *See Phillips*, 415 F.3d at 1321.

EBS's alternative construction is wrong. Instead of looking to the intrinsic record, as it should, EBS bases its alternative construction on a textbook dated more than forty years before the earliest priority date of the Asserted Patents. There is no reason to rely on this arbitrary reference where an explicit definition is provided in

the specification. *See, e.g.*, *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 58 (D. Del. 2003) (warning against reliance on external reference definitions for danger of adopting "an inappropriate construction, one that is inconsistent with . . . the intrinsic record of the patent in suit"); *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 825 (Fed. Cir. 1999) ("The extrinsic evidence proffered by Sextant cannot alter the construction indicated by the intrinsic evidence, thereby injecting an ambiguity where none exists."). Moreover, EBS does not even propose adopting the definition provided in the textbook it cites, but instead carefully edited the textbook's definition by omitting the word "normal"—without explanation and with uncertain consequences. Indeed, the specification is silent as to a "flame-front reaction." Finally, the Ford patent cited by EBS presents yet another definition that depends on the presence of autoignition rather than a flame-front reaction. EBS has presented no compelling reason to depart from the language of the specification, where "end gas is defined as the uncombusted air/fuel mixture remaining after 75% (by mass) of the fuel has combusted." *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016) (Extrinsic evidence may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence.") (quoting *Phillips*, 415 F.3d at 1317).

### 3. Plaintiffs' Reply Position

Ford makes no attempt to dispute that its construction limits the term to the end-gas <u>parameter</u> the inventors used as an input into their computer model. For this simple reason, the inventors did not define the term "end gas"; they simply defined the numerical assumption they used to build their computer model.

Notably, Plaintiffs add the words "has begun" to their alternate construction to clarify that "end gas" refers to "that part of the charge which has not yet been consumed in the normal flame-front reaction." Ex. 22 at 112. In other words, in each engine cycle, there is an ever-decreasing amount of end gas during the flame-front process.

### 4. Defendant's Sur-Reply Position

Ford stands on its arguments in its Answering Brief.

**F. "spark ignition engine"** ['965: Claim 1, 14, 17, 19; '580: Claims 1, 13, 23; '760: Claims 1, 13, 21, 29]

| Plaintiffs' Construction: | Ford's Construction: |
|---|---|
| This portion of each preamble is limiting. | This term is not limiting. |

### 1. Plaintiffs' Opening Position

"A preamble is generally construed to be limiting if it 'recites essential structure ... or if it is necessary to give life, meaning, and vitality to the claim.'" *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014). And as this Court has held, where a preamble provides an antecedent basis for a

claim limitation, it satisfies this standard. *Genentech, Inc. v. Amgen Inc*., 2019 WL 2502932, at *10 (D. Del. June 17, 2019) (Connolly, J.) ("The term 'subject' in the preamble to claim 2 provides antecedent basis for 'said subject' in the body of the claim and, therefore, the preamble is limiting to that extent."). Here, the "spark ignition engine" portion of each preamble at issue does precisely that.

First, the reference to "[a] spark ignition engine" in the preamble of each independent '580 and '760 Patent claim provides an antecedent basis for "the spark ignition engine" recited in the body of each claim. For example, Claim 1 of the '580 Patent recites:

> **1.** A fuel management system for <u>a spark ignition engine</u>, comprising:
>      a first fueling system that uses direct injection;
>      a second fueling system that uses port fuel injection; and
>      a three-way catalyst configured to reduce emissions from <u>the spark ignition engine</u>, ….

Ex. 4 at 16:62-67. Similarly, the body of Claims 1, 13, and 23 of the '580 Patent and Claims 1, 13, 21, and 29 of the '760 Patent all refer to "<u>the</u> spark ignition engine"— a clear reference back to the "<u>a</u> spark ignition engine" recited in their respective preambles. Ex. 4 at 16:62-67, 18:11-16, 19:26-29; Ex. 5 at 17:2-7, 18:37-42, 19:44-47, 20:49-52. Accordingly, each preamble is limiting.

The '965 Patent is similar. Claim 7 recites "[t]he fuel management system of claim 1 where <u>the spark ignition engine</u> employs turbocharging," and the only prior reference to a "spark ignition engine" is in the Claim 1 preamble. Ex. 3 at 17:36-37.

Likewise, the body of Claims 1, 14, 17, and 19 of the '965 Patent each recites a "the fuel management system" limitation, and the only prior reference to a "fuel management system" is in each claim's preamble, which recites "[a] fuel management system for spark ignition engine." *Id.* at 16:64-18:67.

For example, Claims 1 and 19 both recite "[a] fuel management system for spark ignition engine where the fuel management system controls fueling from a first fueling system that directly injects fuel into at least one cylinder as a liquid and increases knock suppression by evaporative cooling and from a second fueling system that injects fuel into a region outside of the cylinder ...." *Id.* at 16:1-17:2, 18:48-53. Claims 14 similarly recites "[a] fuel management system for spark ignition engine where during at least part of the driving time the fuel management system controls fueling from a first fueling system ... and from a second fueling system ...." *Id.* at 17:58-64. Claim 17 does the same. *Id.* at 18:24-26.

For the reasons explained, the reference to a "spark ignition engine" in the preamble of each independent claim of the Bromberg Patents is limiting.

## 2. Defendant's Answering Position

The Asserted Claims recite a fuel management system "for a spark ignition engine," but do not positively recite a spark ignition engine as an affirmative claim limitation. Accordingly, "spark ignition engine" is an intended use, and is not limiting.

"Generally, the preamble does not limit the claims." *Georgetown Rail Equip. Co. v. Holland L.P*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citing *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002)). A claim preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). In this case, the Asserted Claims define a structurally complete invention—a fuel management system—including first and second fueling systems that inject fuel, and a three-way catalyst configured to reduce emissions. The claims are not directed to and do not recite a spark ignition engine as a structural limitation.

EBS argues that the recitation of a "spark ignition engine" in the preamble should be construed as a positive limitation because certain claims of the Asserted Patents refer back to "the spark ignition engine" in the body of the claims. As noted by EBS, certain claims positively recite "a three-way catalyst configured to reduce emissions *from the spark ignition engine*."

Recitations of a "spark ignition engine" in the body of the Asserted Claims are not positive limitations, and therefore do not transform the claimed "fuel management system *for* a spark ignition engine" to "a fuel management system *and* a spark ignition engine." The Federal Circuit has held that a preamble is limiting where its terms provide antecedent basis for and are necessary to understand *positive*

*limitations* in the body of the claims. *See TQ Delta, LLC v. 2wire, Inc.*, 2018 WL 4062617, at *4 (D. Del. Aug. 24, 2018) (citing *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015)). It is clear that subsequent recitations of "spark ignition engines" are further clarifications on the configuration of the claimed fuel management system, and do not positively recite the presence of a spark ignition engine.

The Court has been clear that in such instances, the preamble is non-limiting even though the language of the preamble is recited in the body of the claim. For instance, the Court found that the recitation of a structure in the preamble "[a] panel system to externally envelope *a structure*" was not limiting, even though the claim later recited "wherein the assembled panel system forms a sealed wall or roof of *the structure*." *Huber Engineered Woods LLC v. Louisiana-Pacific Corp*., 2020 WL 5132922 (D. Del. Aug. 31, 2020) (emphasis added). The Court noted that the claims do not necessarily "derive antecedent basis from the preamble" just because a term from the preamble is later referred to in the claims. As in this case, the claim term in *Huber* was simply providing the context "with respect to which the claims are being performed."

The Court has reached the same conclusion in similar cases. In *Zimmer Surgical, Inc. v. Stryker Corp.* the Court held that the preamble "[a] system for handling waste fluid from a patient" was non-limiting, despite providing antecedent

basis for "the patent" in the body of the claim. 2018 WL 3038515, at *5 (D. Del. June 19, 2018) (reasoning that "the mere fact that a . . . term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim."). Similarly, in *Microchip Tech. Inc. v. Aptiv Servs. US, LLC*, the preamble reciting "a USB multi-host device" was found to be non-limiting, despite providing antecedent basis for a later recitation of "the USB device." 2019 WL 2502417, at *7–8 (D. Del. June 17, 2019). The Court noted that the subsequent recitations of the preamble "offer[ed] no distinct definition of any of the claimed invention's limitations, [and] rather merely state[d] the purpose or intended use of the invention." *Id*. at *8.

EBS cites primarily to this Court's decision in *Genentech, Inc. v. Amgen Inc.*, where the preamble's recitation of "a method for inhibiting VEGF-induced angiogenesis in a subject" was found to be ***not*** limiting. 2019 WL 2502932, at *10 (D. Del. June 17, 2019). In that case, the Court determined that the claims at issue recited "a structurally complete invention," and further that "the preamble merely recite[d] the purpose of the invention." *Id.* Although the Court also recognized that the preamble provided antecedent basis for the term "said subject" in the body of the claim, the Court adopted the proposed construction that the preamble was not limiting. *Id.* ("The phrase 'a method for inhibiting VEGF-induced angiogenesis in a

subject' in the preamble of claim 2 of the '269 patent is given its plain and ordinary meaning and is not limiting.").

Accordingly, the Court should adopt Ford's proposed construction, whereby the intended use of the claimed fuel management system "for a spark ignition engine" that is not itself recited as a structural limitation of the claims is found to be non-limiting.

### 3.   Plaintiffs' Reply Position

Ford's argument that the "spark ignition engine" disclosed in each preamble simply states an intended use is wrong for at least two reasons.

First, various claim limitations refer to "the spark ignition engine"—a clear reference back to the "spark ignition engine" recited in each preamble. And the claims demonstrate that this engine is a structural limitation. For example, every claim of the '760 and '580 Patents requires a "three-way catalyst configured to reduce emissions from the spark ignition engine" or a "spark ignition engine … configured" to operate in a certain way. If the recited engine is not a structural limitation, these claim elements would have no meaning.

Similarly, Claims 1, 14, 17, and 19 of the '965 Patent each recite a "the fuel management system" limitation in their body—referencing the "[a] fuel management system for spark ignition engine" in each preamble. As Ford's own case law demonstrates, the preamble reference provides a "distinct definition" that

92

explains "the claimed invention's limitations." *Microchip*, 2019 WL 2502417, at *7–8. It thus is limiting because it is "'necessary to understand' the later reference … in the claim body." *Zimmer*, 2018 WL 3038515, at *5; *TQ Delta*, 2018 WL 4062617, at *4 (same).

Second, the claimed "spark ignition engine" also is "necessary to give life, meaning, and vitality to the claim." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) (quotation omitted). An important aspect of the invention is using direct injection to prevent knock in spark ignition engines, which occurs when unburned "end gas" detonates because, e.g., the in-cylinder temperature is too high. Ex. 34 (Pulkrabek) at 142. In contrast, direct injection does not confer such benefits when used in compression-ignition engines. Ex. 35 (Shaver Decl.) ¶4. In addition, Claims 13-22 and 29-30 of the '580 Patent and Claims 13-20 and 29-33 of the '760 Patent recite that "the fuel management system **is further configured to use spark retard**"—another concept specific to spark-ignition engines. *Id.*

For these reasons, the "spark ignition engine" in each preamble is limiting.

### 4. Defendant's Sur-Reply Position

EBS is wrong: the asserted claims recite a standalone "fuel management system" and not the combination of a fuel management system and an engine.

First, the '965 Patent claims never refer back the "spark ignition engine" recited in the preamble. Therefore, the "spark ignition engine" recited in the preamble of the '965 Patent is nothing more than an intended use and is not a structural limitation. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1324 (Fed. Cir. 2015). EBS's argument in reply that the '965 Patent's preamble is "necessary to understand the later reference … in the claim body" is nonsensical because there is no "later reference" to a spark ignition engine in the body of the '965 Patent claims.

Second, even the claims of the '580 and '760 Patents do not refer to the "spark ignition engine" as a structural limitation. The claims were purposely drafted to recite a "fuel management system *for*" and a "three-way catalyst *configured to*" to avoid the recitation of the engine as a positive claim limitation. Even the recitation in the '580 and '760 Patents of "wherein the spark ignition engine is configured to operate at a stoichiometric air/fuel ratio" is a feature of the claimed fuel management system, and not a structural recitation of an engine. (*See* Ex. 4, 2:48–51 ("[T]he fuel management system disclosed herein [is] for maintaining Stoichiometric conditions with metering/control of ethanol, gasoline, and air flows into an engine.")).

Dated: February 17, 2021

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Of Counsel:

Matthew R. Berry
Andres C. Healy
Steven M. Seigel
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, Washington 98101
(206) 516-3880
(206) 516-3883
mberry@susmangodfrey.com
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

William D. O'Connell
SUSMAN GODFREY LLP
1301 Ave. of the Americas,
32nd Fl.
New York, New York 10019-6023
(212) 336-8330
(212) 336-8341
boconnell@susmangodfrey.com

*Attorneys for Plaintiffs*

Respectfully submitted,

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

/s/Rodger D. Smith II
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com
mflynn@mnat.com

OF COUNSEL:

Michael S. Connor
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street
Charlotte, NC 28280
(704) 444-1022

Natalie C. Clayton
Andrew J. Ligotti
Katie Burkhart
ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, NY 10016
(212) 210-9573

Brian Hill
ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004
(202) 239-3733

*Attorneys for Defendant*

95

## <u>CERTIFICATION OF COMPLIANCE</u>

The foregoing document complies with the type-volume limitation as outlined in Paragraph 16 of the Scheduling Order (D.I. 15).  The text of this brief, including footnotes, was prepared in Times New Roman, 14 point.

/s/ Michael J. Farnan
Michael J. Farnan (Bar No. 5165)

Dated: February 17, 2021

96